**Sherri Lee BARNHILL,**
**Plaintiff/Counter Defendant/Appellant,**

**v.**

**James Howell BARNHILL,**
**Defendant/Counter**
**Plaintiff/Appellee.**

Court of Appeals of Tennessee,
Western Section,
at Jackson.

July 17, 1991.

Application for Permission to Appeal
Denied by Supreme Court Jan. 21, 1992.

Dennis W. Plunk, Savannah, for plaintiff/appellant.

W. Lee Lackey, Savannah, for defendant/appellee.

FARMER, Judge.

This is a divorce action in which the parties appeal the trial court's distribution and valuation of their marital assets, the trial court's custodial award, and the wife appeals the denial of her request for alimony and attorney's fees.

The parties were married August 8, 1971 in Wayne County, Tennessee. Three sons were born of the marriage: one in 1979 and twins in 1981. Prior to the parties' marriage the defendant, James Howell Barnhill (hereinafter "Husband"), received a bachelor degree in math and physics from UT Martin. During the initial stages of the marriage, the parties moved several times because Husband was in the Army. When the parties ultimately moved to Memphis the plaintiff, Sherri Lee Barnhill (hereinafter "Wife"), enrolled in a dental hygiene program at the University of Tennessee. While in school she worked two or three nights a week as a dental assistant and weekends at K–Mart. Husband worked various jobs during this period which included a job at Coca–Cola and painting apartments. Wife graduated from the dental hygiene program in 1975. In January 1976, Husband enrolled in dental school at the University of Tennessee. Husband quit work at this time, but he received G.I. benefits while attending school. He graduated in December of 1978 and began prac-

ticing dentistry in March 1979. Shortly thereafter, Wife became pregnant and quit work for several months. After the oldest son was born Wife began to work for Husband as a dental hygienist.

Husband sold his dental practice in October 1987 to Dr. Benson Parris for $97,500. Wife adamantly protested the sale of this dental practice. Allegedly, Husband sold his practice due to disabling health which was attributable in most part to a disease described as spondylitis. After the sale, Husband received disability insurance in the amount of $3,180 a month. Wife continued to work as a dental hygienist until June 16, 1988 at which time she started Davis–Lee, Inc., a construction company. Prior to the sale of the dental business the parties started a greenhouse and sod operation. Since October 1987 the sod operation has been Husband's main occupation. On November 20, 1989, Husband's disability benefits were terminated.

On November 9, 1988, Wife filed a complaint for divorce and Husband responded with a counter complaint. At the time of the divorce the parties' marital assets consisted of the residence, furniture and household items, bank accounts, IRA's, certificate of deposit, vehicles, Davis–Lee, Inc., the sod business, and certain real estate. Both parties sought custody of the parties' three minor children. After a hearing on this matter, the trial court found that:

> The Court finds that the evidence does not support the allegations in the Complaint filed by Plaintiff, Sherri Lee Barnhill, that the Defendant, James Howell Barnhill, is guilty of cruel and inhuman treatment....

> It further appeared to the Court that the allegations in the countercomplaint filed by James Howell Barnhill are true, and that the counterdefendant, Sherri Lee Barnhill, is guilty of such cruel and inhuman treatment or conduct toward the counterplaintiff, James Howell Barnhill.... and he is, hereby awarded an absolute divorce....

> The Court determined that in the best interest and welfare of the parties' three

minor children ... that Plaintiff and Defendant have Joint Custody of said minor children, with Defendant to have said children during the school year and Plaintiff to have said children during the summer months when said children are not enrolled in school....

> The Court did find that the marital property should be divided equally....

> The Court did find that neither party would owe child support to the other for maintenance of said minor children, but that Defendant will be solely responsible for the maintenance, upkeep and support of the children, particularly in consideration of the finding of the Court that the Sod business awarded to Defendant was much more valuable than the Construction business awarded to Plaintiff....

> [T]hat Plaintiff is not entitled to receive from Defendant alimony....

> and finds that each party shall pay their own attorney's fees....

It is from this judgment that the parties appeal. The issues as set forth by the parties are:

I. Whether or not the trial court erred in granting a divorce to Husband rather than to Wife.

II. Whether or not the trial court erred in its distribution of marital property.

III. Whether or not the trial court erred in failing to award exclusive custody of the parties' three minor children to Wife.

IV. Whether or not the trial court erred in failing to award reasonable alimony to Wife.

V. Whether or not the trial court erred in denying Wife's request for an award of attorney's fees.

VI. Whether or not the trial court erred in failing to rule on Wife's motion in limine to hold inadmissible evidence derived from taped telephone conversations.

VII. Whether or not the trial court erred in not allowing Husband to testify concerning the values of the properties of the parties.

VIII. Whether or not the trial court erred in allowing Emmett Yeiser, Jr., to testify as an expert.

IX. Whether or not the trial court erred in failing to recuse himself since he is not a lawyer.

## I.

### Grounds for Divorce

■ Wife contends that there was insufficient evidence to support the trial court's determination that Wife was guilty of cruel and inhuman treatment. Wife also insists that the preponderance of the evidence supports her position that Husband was guilty of cruel and inhuman treatment. On appeal the trial court's factual findings are accompanied by a presumption of correctness. We will affirm the trial court's factual determinations unless we find that the preponderance of the evidence is otherwise. T.R.A.P. 13(d).

Husband presented evidence that Wife spent an inordinate amount of time with a gentleman friend and business associate; that she threatened Husband with a gun, verbally abused him, threw furniture at him and, that he overheard a conversation between Wife and the gentleman friend indicating that they intended to do him physical harm. Wife contends that Husband exhibited inappropriate marital conduct by selling his dentistry practice and that this placed great stress on their marriage and undue hardship on the family.

Husband testified that he quit practicing dentistry because:

Q Now, just tell the Judge why you quit practicing.

A Well, at the time, I didn't know what specifically was wrong with me, and I had been going to several doctors to find out. I knew there was something wrong with me, and, finally, after a few months, I ended up going to Memphis to have what they call an MRI, a magnetic residence (sic) imaging study done on my lower brain stem and cervical spine region to rule out the possibilities of a couple of fatal neurological diseases, and in the process, they found out that my central nervous system was okay, but they said that I needed to go see a rheumatologist because I had bone spurs on all the vertebrae.

Q All right. Was there anything wrong with your hands?

A Well, that were some of the symptoms that were caused by, come to find out, the bone spurs impinging among the nerve ganglia coming out of the vertebrae were causing pressure on them, which would cause a tingling or paresthesia of the arms and fingers.

Q All right. Now, is that what affected your dental practice?

A That was some of the symptoms. I had, you know, soreness and, like tendonitis. If you grip something, the tendons and the joints would hurt, and after I saw the rheumatologist, he diagnosed me as having spondylitis, which caused osteoarthritis, which is a—what it amounts to is the body is attacking some of its own tissue in the joint and tendon areas, which causes inflammation and the inflammation, in turn, causes excessive bone growth of the bone spurs, which is the arthritis.

Q All right. Now, tell us how that affected your dental practice.

A Well, you can't grip little instruments and stuff, you know, if your fingers are sore and hurting, and, you know, when you bend your neck and look in somebody's mouth for a few minutes and your fingers start going numb and tingling, you don't have the tactical sense that's required to perform the—without sounding too, you know—you've got to have a pretty precise control of your fingers to do quality dentistry without endangering the patient.

Q All right. Now, in other words, was it dangerous to your patients for you to continue the practice in the condition that you were in?

A Well, without good control of, like forceps and elevators and scalpels and stuff, you could, you know, in making an incision or extracting teeth or something, you could very possibly injure a patient.

Q All right, sir. Is that why you had to quit your dental practice?

A Yes, sir.

This issue is primarily one of witness credibility. Since the trial judge had the opportunity to observe the manner and demeanor of the witnesses, the trial court's factual determination involving witness credibility will be given great weight on appeal. *Town of Alamo v. Forcum–James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959). Upon reviewing this rather voluminous record, we cannot say that the evidence preponderates against the trial court's finding that Husband was entitled to be awarded the divorce.

## II.

### *Distribution of Marital Assets*

Wife argues that the marital property division was not equitable and just as required by T.C.A. § 36–4–121. Husband contends, on the other hand, that the disparity in the trial court's distribution was justified. Husband insists, however, that the trial court erred in classifying some of his separate property as marital. The following table depicts our understanding of the trial court's distribution of the Barnhills' marital assets and the value of each item as it appears in the record:

## DISTRIBUTION OF MARITAL PROPERTY

| ASSETS | HUSBAND | WIFE |
| --- | --- | --- |
| Real Estate: [1] | | |
| a) House and 7 acres | $ 87,500 | $ 87,500 |
| b) 43.78 acre tract | $ 32,500 | $ 32,500 |
| c) 18.12 acre tract | $ 30,000 | $ 30,000 |
| d) Greenhouse lot | $ 5,500 | $ 5,500 |
| Household Furnishings | $ 7,072 | $ 7,072 |
| Sod Operation | $136,700[2] | |
| Davis–Lee, Inc. | | $ 1,500 |
| Individual Retirement Accounts: | | |
| a) Boatman's Bank | $ 14,000 | $ 14,000 |
| b) Citizen's Bank | $ 4,000 | $ 4,000 |
| c) Citizen's Bank | $ 2,000 | $ 2,000 |

---

1. All real estate was divided equally between the parties to be held as tenants in common.

2. The only valuation provided for Husband's sod business and Wife's construction business were those produced by Wife. Wife valued Husband's sod operation as follows:

| FARM/SOD BUSINESS Assets | FAIR MARKET VALUE |
| --- | --- |
| 1. 1–ton 1987 blue Ford truck with dumpbed | $ 11,500 |
| 2. 1982 John Deere tractor (2040) Cost $9,800 | 6,000 |
| 3. Blue gooseneck trailer (Cost $5,500) | 5,000 |
| 4. #507–5 ft. bushhog | 500 |
| 5. Tiller—John Deere | 500 |
| 6. Sod cutter No. (walk behind) 1986—W Paid $5,000 | 3,000 |
| 7. Bryar sod cutter—No. D and Ford tractor (3910)—Cost $40,000 1989—Bought while divorce pending from $60,000 CD | 40,000 |
| 8. 1982 sod plugger—No. 1 Pull with tractor Cost $1,800—1987 | 1,000 |
| 9. Sod plugger No. 2 (walk behind) $1,400 | 700 |

| ASSETS | HUSBAND | WIFE |
|---|---|---|
| Certificate of Deposit | | $ 30,000[3] |
| Personal Automobiles/Vehicles: | | |
| a) 1982 Honda ATV (1855) | $ 150 | $ 150 |
| b) 1982 Honda ATV (110) | $ 150 | $ 150 |
| c) 1985 Honda ATV (70) | $ 100 | $ 100 |
| d) Boat/trailer/motor | $ 2,000 | $ 2,000 |
| Cash (Trust for children) | $ 12,000 | $ 12,000 |
| Life Insurance | $ 1,299.41 | |
| DEBTS: | | |
| Payment to Wife on Joint CD | <$ 30,000> | |
| Debt on real estate | <$ 18,000> | <$ 18,000> |
| TOTAL: | $286,971.41 | $210,472 |

T.C.A. § 36–4–121(a) provides that marital property should be equitably divided without regard to fault. An equitable division, however, is not necessarily an equal one. Trial courts are afforded wide discretion in dividing the interest of parties in jointly-owned property. *Harrington v. Harrington*, 798 S.W.2d 244 (Tenn.Ct.App.1990); *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn.1983). Accordingly, the trial court's distribution will be given great weight on appeal, *Edwards v. Ed-*

FARM/SOD BUSINESS Assets

| | | FAIR MARKET VALUE |
|---|---|---|
| 10. | Box blade—tractor implement | $ 250 |
| 11. | Roller—farm—paid $700 | 400 |
| 12. | Roller—small type—cost $250 | 250 |
| 13. | Plant setter | 1,500 |
| 14. | Chain saw No. 1 | 175 |
| 15. | Chain saw No. 2 (newer) | 175 |
| 16. | Hand tools, jigsaws, circular saws, etc. | 750 |
| 17. | Table radial arm saw | 400 |
| 18. | Section harrow—paid $250 | 250 |
| 19. | Flail sod mower—paid $750 used | 400 |
| 20. | Reel sod mower (Jackenbean)—paid $5,000 | 3,000 |
| 21. | New sod mower—bought summer 1989 | 3,000 |
| 22. | Scoop (sod slip)—paid $150 | 100 |
| 23. | One-row cultivator—paid $150 | 100 |
| 24. | 20–M piggy back fork lift—Teldyne Princeton paid $25,000 during divorce | 25,000 |
| 25. | Truck–International w/customized bed (1978) paid $7,500 plus customized bed during divorce | 18,500 |
| 26. | Red trailer (1978)—paid $600 | 100 |
| 27. | Troy–Bilt tiller—cost $600 | 300 |
| 28. | Sod-rotary cutter—$500 | 200 |
| 29. | Leaf blower (on wheels)—paid $500 | 200 |
| 30. | Leaf blower—gas | 50 |
| 31. | Nail gun | 400 |
| 32. | Traveling gun irrigation equipment | 13,000 |
| | TOTAL VALUE | $136,700 |

**3.** The parties had a joint CD for $60,000 which Husband cashed and invested in the sod operation. Therefore, his portion of this CD ($30,000) is included in the sod operation valuation.

*wards*, 501 S.W.2d 283, 288 (Tenn.Ct.App. 1973), and will be presumed to be correct unless we find the preponderance of the evidence is otherwise. *Lancaster v. Lancaster*, 671 S.W.2d 501, 502 (Tenn.Ct.App. 1984). T.C.A. § 36–4–121(c) sets forth factors which are intended to guide the court in making an equitable distribution:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training, or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner, or parent;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party; and

(10) Such other factors as are necessary to consider the equities between the parties.

The court specifically found that the marital property in this case "should be divided equally." Nevertheless, the court proceeded with an unequal distribution. The apparent disparity in the distribution is attributable to the trial court's finding that "neither party would owe child support to the other for maintenance of said minor children, but that Defendant will be solely responsible for the maintenance, upkeep and support of the children, particularly in consideration of the finding of the Court that the Sod business awarded to Defendant was much more valuable than the Construction business awarded to Plaintiff...." Since Husband is the primary caretaker and retains physical custody of the parties' minor children, the trial court awarded him all of the sod farm equipment. We think this division was appropriate.

Both parties are well educated. Husband has been forced to retire from his dental practice in light of his continuous health problems and difficulties. The record reflects that Husband's present and potential income is modest. Husband no longer receives disability insurance and his 1988 income tax return reflected that he only made $19,135.78 from his sod operation. Husband estimated that his 1989 income from his sod operation would be only somewhat better, between $25,000 to $30,000. While Wife only netted $1,760.55 in 1988 from her Davis–Lee, Inc. construction business, she testified that she was capable of earning between $21,000 and $22,000 as a dental hygienist. Therefore, in light of Husband's current health status the parties' earning capabilities are basically equivalent. After reviewing the pertinent factors in T.C.A. § 36–4–121(c) as they pertain to the facts in this case, we agree with the trial court that an equitable division is an equal one. Nevertheless, since Wife's wherewithal to provide or pay child support at this time is limited at best, we feel the trial court's additional distribution to Husband was warranted. The justification for this part of the trial court's award would be the parties' equal and joint obligation to support the children. T.C.A. § 36–5–102 specifically authorizes such a distribution:

**Portion of spouse's estate decreed to spouse entitled to alimony or support.**—In such case, the court may decree to the spouse who is entitled to such alimony or child support such part of the other spouse's real and personal estate as it may think proper. In doing so, the court may have reference and look to the property which either spouse received by the other at the time of the marriage, or afterwards, as well as to the separate

property secured to either by marriage contract or otherwise.

This additional award is "based upon the placing of [the] primary burden of support of the children upon the father[.] ... [I]n any future proceedings between the parties in reference to child support, the division of property in said decree will be a proper matter for consideration." *Edwards v. Edwards*, 501 S.W.2d 283, 292 (Tenn.Ct.App. 1973).

■ The trial court found $24,000 of the parties' marital property should be deposited "in trust for the use and benefit of the parties three minor children, to be disbursed for their college or higher education.... In the event any of said children shall not elect to attend college, or obtain higher education, then the parties shall pay to such child not attending college or receiving higher education his share of these funds on this (sic) 25th birthday...." Wife insists this award was not proper and these funds should have been distributed equally between the parties. As noted in this opinion, child support for the parties' children has been adequately provided. This is not a case where the obligor spouse has substantial income and a trust is set up as part of the parents' child support obligation. *See* § 1240-2-4.04(2)(a) of the Child Support Guidelines. Essentially, this award obligates the parties to pay child support beyond the children's age of majority. In Tennessee, the parental duty to support a child terminates when the child reaches majority and a trial court is without authority to extend it beyond that time.[4] *Parker v. Parker*, 497 S.W.2d 572, 575 (Tenn.1973); *Whitt v. Whitt*, 490 S.W.2d 159, 160 (Tenn.1973). Therefore, the trial court's decree should be modified to reflect equal distribution to the parties.

Husband argues that the trial court erred in classifying some of his separate property as marital. Specifically, Husband contends that the greenhouse property valued at $11,000 was given to him by his father, that the 18 acre tract of land was purchased with Husband's inheritance, and lastly, that Husband received $75,000 as an inheritance and an appropriate amount should be classified as separate property.

■ Tennessee is a dual property state, distinguishing between marital and separate property. T.C.A. § 36-4-121(a) only provides for the division of marital property. *See Batson v. Batson*, 769 S.W.2d 849, 857 (Tenn.Ct.App.1988). T.C.A. § 36-4-121(b)(2) defines separate property as:

all real and personal property owned by a spouse before marriage; property acquired in exchange for property acquired before the marriage; income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); and property acquired by a spouse at any time by gift, bequest, devise or descent.

Marital property is defined in T.C.A. § 36-4-121(b)(1) as:

all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date; including income from, and any increase in value during the marriage, of property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation and the value of vested pension, retirement or other fringe benefit rights accrued during the period of the marriage. As used in this definition, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, par-

---

4. This period does extend, however, until the child graduates from high school, T.C.A. § 34-1-101, or when a child is physically or mentally incapacitated the duty may extend beyond majority. *See Sayne v. Sayne*, 39 Tenn.App. 422, 284 S.W.2d 309 (1955).

ent, or family financial manager, together with such other factors as the court having jurisdiction thereof may determine. Property shall be considered marital property as defined by this subsection for the sole purpose of dividing assets upon divorce and for no other purpose. . . .

Husband testified that he netted between $14,000 and $20,000 from his father's estate after the estate forgave a $60,000 outstanding loan. Therefore, Husband contends that he inherited approximately $75,000. Husband argues that $75,000 of the parties' marital estate should have been considered the separate property of Husband.

We must disagree. Husband's father loaned and/or gifted $60,000 to the defendant and/or defendant and plaintiff to purchase the 18 acre tract of land mentioned hereinabove. Upon his father's death the loan was forgiven as part of Husband's inheritance. Whether this money was viewed as an inheritance or a gift, the funds therefrom are clearly marital property at this time. Separate property may become marital property when there has been a transmutation of the separateness. The doctrine of transmutation was clearly defined in *Batson*, 769 S.W.2d at 858:

> [Transmutation] occurs when separate property is treated in such a way as to give evidence to an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

769 S.W.2d at 858, *citing* 2 H. Clark, *The Law of Domestic Relations in the United States*, § 16.2, 185 (1987).

This 18 acre tract of land was acquired on December 12, 1983 and registered in the names of both Husband and Wife. By assuming title in joint tenancy, there exists a rebuttable presumption the Husband made a gift to the marital estate. *Id.* There was no intent evident in the record that Husband intended that this property remain separate. As to the $14,000 to $20,000 proceeds actually distributed as inheritance upon his father's death, there is no evidence that these funds were kept separate or even where the funds are at this time. Clearly there has been a transmutation of these funds.

Husband also argues that the greenhouse property was a gift to him. Again, the title to this property is in joint tenancy of Husband and Wife. In the absence of proof that Husband intended for this gift to remain separate, we find that this property also is marital property.

## III.

### Child Custody

Both Husband and Wife contend that they should have been awarded sole custody of the parties' minor children. The trial court found that joint custody was appropriate in this case and that Husband is,

> to have said children during the school year and Plaintiff to have said children during the summer months when said children are not enrolled in school. . . .

> Specifically, that during the school year, the Court determined Plaintiff shall have custody of the children every weekend from Friday afternoon until Sunday evening, with the exception of every other Sunday on which Sunday Defendant have said children. . . .

> Further, during the childrens' [sic] school year, when Defendant shall have primary custody of the children during the school week, Plaintiff shall have supervision and custody of said children for reasonable visitation and participation in

school, church and other extracurricular activities of the children, such as Scouts and athletic programs, upon prior announcement and arrangements....

[W]hen said children are not in school, but are out of school for periods such as Thanksgiving and Christmas vacation, Spring break and other breaks during the school year, Plaintiff shall have custody and supervision of said children.

The parties shall alternate having said children in their custody and supervision on major holidays, which shall include Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day, and also alternate the childrens' [sic] birthdays....

Defendant should have said children for visitation every other weekend during the summer months when said children shall be in the custody of Plaintiff....

In determining matters of child custody our primary concern is the best interest and welfare of the parties' minor children and all rights of the parties will yield to that primary concern. *Dantzler v. Dantzler*, 665 S.W.2d 385 (Tenn.Ct.App.1983). In light of the boys' ages in this case, the tender years doctrine has no application.

■ The record in this case reveals that Husband has been the children's primary caretaker during the latter course of the parties' marriage. Husband has been responsible for most of the boys' raising. Husband testified that when the parties' children were young he and his wife shared the responsibilities of taking care of the children. However, as the children got older Mr. Barnhill testified that 95 percent of the time he would get up in the mornings and cook the children breakfast and take them to school. Furthermore, after Wife's association with Mr. Johnson commenced Wife was gone from the home several nights a week.

Lance Foster, the minister of Mt. Zion Church of Christ, and Ms. Linam, a former friend of both parties, testified that prior to the filing of this complaint Husband had the children the majority of the time. Both witnesses were of the opinion that Husband was the better parent. Ms. Linam

even testified that she confronted Wife about her inattentiveness to the children:

A Sherri [Wife] come over to bring a birthday present to my oldest daughter, Shelley, and I thought that would be the opportunity as a friend to talk to her about the children being upset and about her being away from home all the time, and I told her about the kids being upset and, of course, Shelley baby-sits quite a bit for Sherri and James, and we discussed about her and Mitchell being together a lot and about—I told her I thought—

Q What was her response to all of that?

A She didn't really have much to say.

Q All right.

A And I asked her, I said, "Don't you have any question to put back at me?", because I was really concerned about the boys. But, of course, James was taking care of the boys, but Sherri was gone all the time—

Q All right.

A —at night, and I asked her, I said, "Don't you think they need a mother?" I said, "They need a mother." And she said, "They've got one." And I said, "Who?" And she said, "James."

Q James was their mother.

A Yes, sir.

Wife's mother testified that Husband was a good father and that when she would call or come by the parties' home Husband would routinely be the one there taking care of the children.

■ Wife insists that she was improperly denied custody of her children as punishment for her conduct. Custodial arrangements should not be made with the goal of punishing a parent for misconduct. Nonetheless, misconduct of a party does often reflect fitness of the parent for custody and is a proper consideration. *Edwards*, 501 S.W.2d at 291. Wife also argues that Husband should not be the primary caretaker of the parties' minor children because of his philosophy towards the children's extracurricular activities. Husband admitted during cross-examination that he had the philosophy that work should be the

predominant factor in the children's lives or take priority over their extracurricular activities.

Normally, joint custody is not in the best interest of the children. *See Dodd v. Dodd*, 737 S.W.2d 286 (Tenn.Ct.App.1987). However, we cannot say that the evidence preponderates toward the contrary in this case. Husband in this case has been an exemplary father and we are of the opinion that the best interest of the parties' minor children can best be served with him as the primary caretaker. However, we feel it is essential that Wife have an equally active role in the children's emotional and physical development. It appears that Wife loves and cares for her children a great deal despite her periods of inattentiveness. She has actively engaged the children in sports and Boy Scouts and we feel that the trial court's structure of this custodial arrangement will continue to enforce these extracurricular activities. After reviewing the record we are of the opinion that this custody arrangement has been suitably structured to fit the present situation.

With respect to visitation, we have heretofore noted that the trial court granted Wife every weekend during the school year (at which time they are in the custody of their father), every weekend from Friday afternoon until Sunday evening, with the exception of every other Sunday, on which Sunday Husband to have the children. Our careful review of this record convinces us that the best interest of the children would be best served by amending the decree to provide that Mother have the children every other weekend from Friday afternoon until Sunday evening. We do not feel it would be in the children's best interest to deprive Father of every whole weekend during the school year. Further, we have determined that it would be in the best interest of the children to alter the vacation schedule ordered by the trial court to provide that the parties should alternate having the children during school spring break and Thanksgiving and Christmas vacations. In that regard, beginning in 1991, Mother should have visitation rights for the *Thanksgiving* weekend. During Christmastime 1991, Mother should have visita-

tion with the children from the day school lets out at the beginning of Christmas vacation to the morning of December 26. At that time Father should have visitation rights from December 26 through the balance of the Christmas vacation. In 1992 and thereafter, the parties should alternate taking first the initial portion of the Christmas vacation and subsequently the latter part of the Christmas vacation. Beginning in 1992, Mother should have visitation rights over the spring break school vacation. These rights should inure to Father in 1993 and they should alternate thereafter. The decree is further modified to add Easter to the major holidays to be alternated.

 Wife also argues that she is entitled to child support during the summer months when she has primary custody of the children. As heretofore mentioned, the trial judge took the custodial arrangement into consideration when he divided the marital property. It does not appear to be inequitable to deny Wife child support during these three months in light of the fact that she is not paying a monthly obligation to Husband during the nine months he is primary caretaker. Furthermore, as evidenced by the Child Support Guidelines promulgated by the Tennessee Department of Human Services, the "obligor" for purposes of child support is the parent "with whom the child(ren) do not primarily live." § 1240–2–4.03(1). The time spent with the obligor parent is taken into consideration in determining the obligor's child support obligation. *Id.* at § 1240–2–4.02(7). In light of the marital property awarded to Husband we feel this was a factor the trial court properly considered.

IV.

*Alimony*

 Wife appeals the trial court's denial of her request for alimony. Wife alleges that she is entitled to alimony under the factors set forth in T.C.A. § 36–5–101(d) which provides:

(d) It is the intent of the general assembly that a spouse who is economically

disadvantaged relative to the other spouse be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve his or her earning capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age, and physical and mental condition of each party;

(5) The extent to which it would be undesirable for a party to seek employment outside the home because he or she will be custodian of a minor child of the marriage;

(6) The separate assets of each party, both real and personal, tangible and intangible;

(7) The provisions made with regard to the marital property as defined in § 36–4–121;

(8) The standard of living of the parties established during the marriage;

(9) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(10) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(11) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Need of the obligee spouse and the obligor's spouse's ability to pay are the two most important factors in determining the appropriate amount of alimony, if any. *Campanali v. Campanali,* 695 S.W.2d 193 (Tenn.Ct.App.1985); *Hall v. Hall,* 772 S.W.2d 432 (Tenn.Ct.App.1989).

Wife argues that the parties enjoyed a relatively high standard of living during the course of the marriage. Wife insists that since Husband's professional earning capacity as a dentist is substantially higher than hers as a hygienist, then Husband should be required to pay a reasonable amount of alimony. The parties' financial records indicate that Husband's net profit from his dentistry practice was $32,775.25 for 1985, $39,677.31 for 1986, and $49,-184.54 for 1987, while Wife's income as a hygienist was approximately $21,000. Wife contends her monthly needs are $4,000 per month while Husband testified that his monthly living expenses were $1,500. Additionally, Wife contends she is entitled to alimony because Husband withdrew funds from the parties' checking accounts, joint CD and cancelled her credit cards.

The marital distribution took into consideration the funds that Husband withdrew and invested in his sod operation. Wife was distributed her appropriate share. Wife would like us to punish Husband for his faults while she ignores the fact that she was responsible for the ultimate demise of the marriage. Additionally, as we have noted the parties' present earning capacities are approximately equal. Wife

would have us compel Husband to return to his dentistry practice despite Husband's present state of health in order to provide her with additional support. Wife's $4,000 monthly estimate of her expenses includes expenses which are attributable to the primary caretaker of the minor children. Since Wife will not have this responsibility, these expenses shall be significantly reduced. Furthermore, since Husband is the primary caretaker of the parties' minor children, then his current employment status is more beneficial to the children. In light of Wife's present earning capacity, education, and the property division in this case we are of the opinion that an alimony award would be inappropriate.

## V.

### *Attorney's Fees*

Wife contends that the trial court erred in failing to award her attorney's fees in that the trial court based its decision upon "a policy that each person pay their own attorney fees." Wife argues that the trial court's stated "policy" contravenes T.C.A. § 36–5–101(i), which gives trial courts statutory authority to award attorney's fees in divorce cases. Specifically, T.C.A. § 36–5–101(i) provides:

(i) The court may, in its discretion, at any time pending the suit, upon motion and after notice and hearing, make any order that may be proper to compel a spouse to pay any sums necessary for the support and maintenance of the other spouse and to enable such spouse to prosecute or defend the suit and to provide for the custody and support of the minor children of the parties during the pendency of the suit, and to make other orders as it deems appropriate. Spousal support may include expenses of job training and education. In making any order under this subsection, the court shall consider the financial needs of each spouse and the children, and the financial ability of each spouse to meet those

needs and to prosecute or defend the suit.

Although we are of the opinion that the trial judge's "policy" is unsupported by the legislative intent of T.C.A. § 36–5–101(i), we do not feel that this policy affected the result. If the final decree awards Wife sufficient funds out of which her needs and counsel fees can be reasonably met, then an award of attorney's fees is inappropriate. *Franklin v. Franklin,* 746 S.W.2d 715 (Tenn.Ct.App.1987); *Ingram v. Ingram,* 721 S.W.2d 262 (Tenn.Ct.App.1986); *Duncan v. Duncan,* 686 S.W.2d 568 (Tenn. Ct.App.1984). The award of attorney's fees and legal expenses is largely in the discretion of the trial judge, and the trial court's determination will not be disturbed unless we find the evidence preponderates toward the contrary. *Luna v. Luna,* 718 S.W.2d 673 (Tenn.Ct.App.1986); *See* T.R.A.P. 13(d).

As noted, Wife was awarded significant assets in the final decree of divorce. Wife's liquid assets alone consists of $20,000 in individual retirement accounts, $30,000 that Husband is required to pay to Wife out of CD proceeds which he used to buy farm equipment, and $12,000 [5] cash. We feel Wife was afforded sufficient funds out of which her needs and counsel fees can reasonably be met.

Wife also argues that she is entitled to attorney's fees for subsequent contempt proceedings that she has instituted following the divorce action. As we have noted this is largely a discretionary matter and we do not feel that the trial court abused this discretion.

## VI.

### *Tape Recordings*

Husband was secretly intercepting and recording telephone conversations between Wife and other parties on the family telephone line. Prior to trial Wife filed a written motion in limine to prevent the tapes from being played. The trial court

5. As modified by this opinion.

took the motion under advisement and the divorce proceedings continued without granting or denying Wife's motion. The proceedings commenced for four days until the trial judge finally ruled on Wife's motion. The trial judge ruled that the tapes were inadmissible. Wife contends that this ruling came too late to eliminate the prejudicial effect. We find Wife's argument without merit. The tapes were never allowed into evidence. Any error that was caused by the trial judge's delay in ruling on this motion in limine was harmless error.

Wife also argues that objectionable testimony was allowed into evidence concerning the contents of the tape. Third parties were allowed to testify about what Wife had said in these tapes. We find Wife's argument without merit. In fact, Wife's counsel initially elicited, during re-direct examination of Robbie Davis Hime, the conversations that took place on the tapes. The only objectionable testimony that Wife has raised on appeal with regard to these tape recordings is when Husband's counsel asked Husband,

Q All right. Did you hear any discussion between your wife and another lady concerning your wife making Mr. Wheeler and Mr. Johnson jealous?

A Yes, sir. Joy Davis, who's now divorced and goes under the name of Joy Reed, who—

MR. PLUNK: I want to object to, I guess this is what we're getting into, these people that are about to testify against, it's going to be hearsay.

MR. TATUM: Well—

MR. PLUNK: And we raise our objection, again, on anything that's—because, obviously, Mr.—I haven't heard the tapes, but Mr. Tatum has heard the tapes, and he's apparently asking questions of the stuff that he's heard off of these tapes, and about the client and his third parties and these statements made outside the Court.

MR. TATUM: Your Honor, I was just going to ask him about what his wife said, not what this other lady said.

THE COURT: Do you still object?

MR. PLUNK: It would be hard to do, yes, sir. I think the way that he started answering, he needs to lay—

MR. TATUM: Well, let me rephrase my question.

Q (By Mr. Tatum) Now, don't state what this other lady said, just state what your wife said with respect to making these two men jealous. This is just your wife, now. Don't say what the other woman said.

A She said that—I don't know the exact words. I'd have to listen to the tape again, but she said that she had told Mitchell that she'd sat down and got a phone call, just guess who it was, and she had told him that she had gotten a phone call from Randy Wheeler, and she said that she—it's hard to tell this without telling the other side of the conversation. She said that Mitchell had thought that he was through having to deal with that one that was down in town anymore, and this part, the little jealousy, for him to find out that, you know, that he still had to contend with Randy Wheeler.

Whether this testimony was properly admitted need not be decided because there is sufficient evidence in the record to conclude that Wife was guilty of cruel and inhuman treatment without the foregoing statements.

## VII.

### Owner's Valuation of Property

Husband contends that the trial court erred in refusing to allow him to testify regarding his opinion of the value of the parties' real property. As we have mentioned, the trial court distributed all real property in this case equally with the parties as tenants in common. Since we have concurred in this distribution, this issue is moot.

## VIII.

### Expert Testimony

Husband contends that the trial court erred in allowing Emmett Yeiser, Jr., to

testify as an expert in light of his limited qualifications. Wife called Emmett Yeiser, Jr., to testify as to the fair market value of the parties' real estate in this cause. Again, in light of the marital distribution of the real estate this issue is moot.

## IX.

### *Non-lawyer as Judge*

The trial judge in this divorce proceeding was not a lawyer. Husband contends that allowing a non-lawyer judge to decide the custody of the children and to decide property rights in a divorce case is a denial of the constitutional rights of the parties under the Fourteenth Amendment of the U.S. Constitution as a denial of due process and equal protection of the laws. Additionally, Husband contends it is a denial of their rights under Article 1, Section 8 of the Tennessee Constitution. Husband contends that it was error for the trial judge not to recuse himself on the basis that he was not a lawyer. Husband has raised this issue for the first time on appeal. There is no evidence that Husband made a motion or objected at the trial court level. Therefore, this issue is waived. *See Campbell County Board of Education v. Brownlee–Kesterson, Inc.*, 677 S.W.2d 457 (Tenn.App.1984).

The judgment of the trial court is affirmed as modified and remanded for proceedings consistent with this opinion. The costs of this appeal are taxed to the appellant for which execution may issue if necessary.

TOMLIN, P.J., (W.S.), dissents in part.

CRAWFORD, J., concurs.

TOMLIN, Presiding Judge, Western Section, dissenting.

I respectfully dissent from that portion of the majority opinion affirming the trial court's action in awarding the parties joint custody of their two minor children.

The language of the trial court's decree awarding custody may be found in the majority opinion. In short, the decree provides that Father is to have custody of the children during the school year, and Mother is to have them during the summer months when they are not enrolled in school. Nonetheless, the order provides that during the school year Mother is to have "custody" of the children every weekend from Friday afternoon to Sunday evening, except for every other Sunday when Father is to have the children.

The order further specifies that Father is to have "primary custody" of the children during the school *week*. However, insofar as the children's "participation in school, church and other extracurricular activities ... such as Scouts and athletic programs," Mother is to have supervision and custody of the children.

In this writer's opinion, the potential for conflict between the joint custodial parents is substantial. This conflict will only inure to the detriment of the children. While acknowledging that through *Dodd v. Dodd*, 737 S.W.2d 286 (Tenn.App.1987) this Court has spoken strongly against joint custody, I fear that under the facts of this case the majority has failed to give full recognition of the depth of the thrust of *Dodd*. Therein this Court stated:

Notwithstanding the fact that joint custody of minor children is permitted by statute, we have found it necessary to reverse a large number of such decrees during the past several years. The experience of this Court has been that joint custody rarely, if ever, works—for the children. There needs to be one residence, one haven in all the storms of life, including those storms whipped up by the winds of divorce. There needs to be one parent with primary control and responsibility for the upbringing of the parties' children, whenever possible. Custody, in reality, means responsibility for the care, nurture and development of the mental, emotional and physical needs of the child. The custodial parent should expect and receive cooperation and assistance from the non-custodial parent in every respect to serve the best interests of their child or children.

In contested divorces, when feelings are usually heated and emotions run high, it would appear to this Court that joint custody would not serve the best interests of the child. Even when the circumstances of the case would suggest joint custody, for it to be successful *would require a harmonious and coopera-tive relationship between both parents.* *Id.* at 289–90.

Under the terms of the trial court's or-der, Father has "primary custody" during the five-day school week for approximately nine months, but the baton passes to Moth-er every weekend. Furthermore, the order provides that Mother will have the "super-vision and custody" of the children's in-volvement in extra-curricular activities of school, church, athletics, and Scouts during the school week.

If there were no conflicts between the parties previously, they now have been built in by virtue of the trial court's decree. This relief was undoubtedly fashioned as a result of the testimony of the parties to the effect that Father believed that the work ethic should take predominance over the children's lives as opposed to their involve-ment in extra-curricular activities. Joint custody calls for mutuality of decision-mak-ing regarding the children.

The majority opinion seeks to soften the blow of joint custody to some degree by tempering the visitation rights of the par-ties, particularly in allowing Father visita-tion every other weekend rather than let-ting Mother have visitation every weekend. Notwithstanding this, Father and Mother still are faced with the built-in conflict to which we have already alluded in that un-der the majority opinion Mother will have the "supervision and custody" of the chil-dren's extra-curricular activities involving school, church, athletics, and Scouts during the school week.

As noted in the majority opinion, the record in this case clearly establishes that Father has been and should be considered the better parent of the children. The ma-jority opinion notes without contradiction that although Father and Mother shared the responsibilities of raising the children when the children were younger, as they

grew older the responsibility shifted more and more to Father. The majority opinion notes also that the parties' minister, along with a former friend of both parties, testi-fied that in their respective opinions Father was the better parent. It is significant to note that the majority opinion observed that "[w]ife's mother testified that Hus-band was a good father and that when she would call or come by the parties' home Husband would routinely be the one there taking care of the children."

In child-custody matters, the welfare of the children involved is the polestar. As Judge Conner said in *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn.App.1983), "[i]t is the ... *alpha and omega.*" Not only does the *decree* regarding custody as fashioned by the trial court work against the welfare of the children, but the *evidence* preponder-ates *against* a finding of joint custody and actually preponderates in favor of custody to Father. Accordingly, I would award absolute and complete custody and control of the children to Father. I otherwise con-cur in the balance of the majority opinion.