IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 5, 2003 Session

## SYNTHIA M. HOPKINS v. VICTOR L. HOPKINS

**Appeal from the Chancery Court for Montgomery County**
**No. 2001-01-0072     Carol Catalano, Judge**

_____

**No. M2002-02233-COA-R3-CV - Filed June 25, 2003**

_____

The trial court granted the wife an absolute divorce, and fashioned a parenting plan that gave the husband primary physical custody of their three children during the school year, with the wife to exercise primary physical custody during the summer. The wife argues on appeal that the trial court's plan gave the husband more custodial time than he had asked for, and far more than he was entitled to. She also argues that the trial court erred in its division of marital property, by giving the husband the benefit of an offset for a purported loan from his parents. We reverse the trial court's custody order, but affirm its property division.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part; Reversed in Part; and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Mark A. Rassas and Julia P. North, Clarksville, Tennessee, for the appellant, Synthia M. Hopkins.

Sharon T. Massey, Clarksville, Tennessee, for the appellee, Victor L. Hopkins.

**OPINION**

### I. MARRIAGE AND ESTRANGEMENT

Synthia Sue Moore and Victor Lee Hopkins married on May 26, 1990. The wife had just finished college, and the husband still had a year to go before completing his bachelor's degree. During that year, the wife worked full-time to help her husband finish college, while he worked part-time. After he graduated, Mr. Hopkins got a job at Trane Industries, and became the family's primary breadwinner, while Ms. Hopkins took the role of homemaker.

The parties purchased a marital home, with Victor Hopkins' parents furnishing the $17,000 down payment. Three children were born of the parties' marriage, two boys and a girl. Though both

parents maintained an active involvement in their children's upbringing, they began to experience marital difficulties in the year 2000, when Mr. Hopkins began spending less time at home, and became emotionally distant from his wife.

Ms. Hopkins questioned her husband about this, and he stated that he didn't love her anymore, and that he wanted out of the marriage. He also pushed his wife away physically, rebuffing any gestures of affection she tried to make towards him. She suggested counseling. He agreed. The parties went to two or three sessions with a marriage counselor. During those sessions, Mr. Hopkins repeated that he did not love his wife and that he wanted out.

Synthia Hopkins filed a Complaint for Absolute Divorce in the Chancery Court of Montgomery County on January 22, 2001. Ms. Hopkins cited irreconcilable differences and inappropriate marital conduct as grounds. She asked for primary custody of the children, child support, alimony, and an equitable division of the marital property. Her detailed parenting plan proposed that Mr. Hopkins have visitation every other weekend, during alternating holidays, and for two weeks vacation during the summer.

Victor Hopkins filed his Answer and Counter-Complaint for divorce on February 7, 2001. He denied that he had been guilty of inappropriate marital conduct, but admitted that there were irreconcilable differences between the parties. Mr. Hopkins also submitted his own parenting plan, which divided the custody of the children equally between the parents, with custody alternating on a weekly basis.

Mr. Hopkins continued to live in the marital home after his wife filed the Divorce Complaint. With the assistance of his parents, he began building a house next door to the marital home so he would remain near the children after he moved out. He moved into the new house two months before the trial of this case, and the parties began alternating custody on a daily basis.

## II. DIVORCE PROCEEDINGS

The final hearing on the divorce was conducted on June 4, 2002. Each party acknowledged that the other was a good parent to the children, but they both testified as to arguments and disagreements over financial issues and child-rearing practices. For example, Synthia Hopkins testified that she believed that her husband's inclination to have all the children sleep in the same king-size bed with him was not consistent with their need for privacy and independence.

Ms. Hopkins also testified that her four-year-old daughter received great benefit from spending time with other children of the same age when attending daycare/pre-school at "Little Country Schoolhouse." Victor Hopkins testified that for both financial and emotional reasons, it was better for the little girl to be taken care of by the paternal grandmother when the parents were working.

The mother testified that she thought that alternating custody during the school year as the father had proposed would be very disruptive to the children's lives. When the father's attorney asked the mother about the parenting plan proposed in her divorce complaint, the chancellor interjected, "I've read both parties' shared parenting plan and, to tell you the truth, have done one of my own."

The parties also testified in some detail about their financial circumstances. Synthia Hopkins went back to work as a substitute teacher in January 2001, when she discovered that her husband had somehow eliminated her access to their joint bank accounts. She eventually obtained a full-time job as a first grade teacher with the Clarksville-Montgomery County School District. The full-time salary is $28,500 per year. She testified that she would like to earn her Master's Degree, because it would enable her to obtain an immediate $3,000 per year salary increase.

At the time of trial, Mr. Hopkins had been employed by the Trane Company for nine and a half years, and his gross annual income had reached $67,000. He testified that his work hours are flexible enough to allow him to come home at 4:00 p.m. almost every day, and take his children to baseball practice. His parents paid for the construction of a new house for him, next door to the marital home (although he apparently furnished much of the labor). He has agreed to pay rent of $500 or $700 per month to his parents (there was some inconsistency in his testimony). Mr. Hopkins has a 401(k) retirement plan through his employer with a value of $84,326.

One area of contention involved the contribution Mr. Hopkins' parents made to the marital home. As we stated above, the parents furnished $17,000 for a down payment on the home. Shortly before trial, they filed suit against their son and daughter-in-law in General Sessions Court for breach of contract. They claimed that the money was meant to be an undocumented loan rather than a gift, and asked the court to award them $15,000, in accordance with the jurisdictional limits of the General Sessions Court.

At the conclusion of the proof, the chancellor announced her decision from the bench. She declared that she would grant the divorce to Synthia Hopkins on the ground of inappropriate marital conduct, and dismiss Victor Hopkins' petition for divorce. As for the parenting plan, the chancellor stated that the best interest of the children and of the parties was best served by a plan different from either of the ones submitted by the parties.

The judge's findings and conclusions were memorialized in the Final Decree of Divorce, filed on July 19, 2002. The court found that the mother's desire to begin a Master's Degree program was reasonable, but that the demands of such a program, when combined with her full-time teaching job, would necessarily limit the time she had available to meet her children's needs. The court also noted that the father had a great deal of flexibility in his job, and that he did not need any further education. The father was accordingly given custody of the children during the school year, with visitation by the mother, while the mother was given custody during summer vacation, with visitation by the father.

The chancellor calculated that her plan would give the father about 230 custodial days with the children each year, and the mother about 135 days. The mother was ordered to pay child support of $681 per month, a slight downward deviation from the guidelines, because she would have the children more than the typical non-custodial parent.

The wife was awarded rehabilitative alimony of $277.77 per month for 36 months, based on her testimony that it would cost about $10,000 to earn her Master's degree, and that if she took one course per semester, it would take three years. The wife was also awarded the marital residence, and ordered to hold the husband harmless for any indebtedness on the property. The court found the equity in the home to be about $35,000.

The chancellor also declared her intention to make an equal division of the husband's 401(k). She held, however, that the full $84,000 balance in the account had to be reduced by set-offs before the division was calculated. The set-offs included the $17,000 allegedly owed to the husband's parents, which the court made the husband solely responsible for satisfying.

A further set-off of about $12,000 was ordered to equalize the division of the equities in the other marital property. The court noted that the marital home and a vehicle awarded to the wife had a total equitable value of $36,000, while a 26 acre tract that was awarded to the husband, together with the vehicle he was awarded had a total equitable value of $24,000. The set-offs reduced the divisible portion of the 401(k) to about $55,218. The result was a determination that the wife was entitled to receive $27,609 from the husband, representing her share of the retirement account. The parties were also ordered to pay their own attorney fees. The wife filed a Motion to Alter or Amend the Judgment, which was denied. This appeal followed.

### III. THE PARENTING PLAN

While pointing out that a jury cannot grant a plaintiff a larger recovery than is asked for in the pleadings, *see Brown v. Null,* 863 S.W.2d 425 (Tenn. Ct. App. 1993), the appellant readily concedes that a trial court does have the power to fashion a parenting plan that is in the best interest of the children, even if that plan differs from the plans or expectations of both parties. *See Steen v. Steen*, 61 S.W.3d 324 (Tenn. Ct. App. 2001); *Barnhill v. Barnhill*, 826 S.W.2d 443 (Tenn. Ct. App. 1991); *Bah v. Bah*, 668 S.W.2d 663 (Tenn. Ct. App. 1983). The appellant argues, however, that it is not in the best interest of the children to reduce the mother's participation in their upbringing to the extent required by the trial court's plan.

The appellant also argues that the trial judge had pre-judged the evidence by announcing that she had a plan of her own, prior to hearing all of the parties' testimony. She further contends that some of the court's statements during the hearing on her Motion to Alter and Amend indicate improper motive on the part of the judge -- that she wished to punish the mother for being unwilling to share custody of the children with their father on an equal basis.

It is well-settled that child custody and visitation should not be granted or withheld for punitive purposes. *Adelsperger v. Adelsperger,* 970 S.W.2d 482 (Tenn. Ct. App. 1997); *Turner v. Turner*, 919 S.W.2d 340 (Tenn. Ct. App. 1995). The determination of custody should always be made upon the basis of the best interest of the child, and in accordance with the factors set out in Tenn. Code Ann. § 36-6-106 and Tenn. Code Ann. § 36-6-401.[1] While there is no proof that the trial judge was acting out of an improper motive, we think that the relevant statutory factors support an equal division of custody between the parties. These include,

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;

Tenn. Code Ann. § 36-6-106(a).

The proof shows that the parties are equally loving towards their children, and equally disposed to nurture them and meet their material needs. The mother was their primary caregiver prior to the filing of the divorce complaint. Afterwards, both parents shared those duties in a more or less equal fashion. Since the mother remains in the marital home, and the father lives next door, continuity and stability would not appear to be a problem. The grandparents furnish additional stability, and are willing to help out in bringing up the children. There is no indication in the record that either parent has mental or physical problems that would affect their care of the children. The older children are doing well in school, while the youngest is also apparently developing well. We note also that as a trained and licensed teacher, the mother brings an educator's perspective to the task of child rearing.

The court's rationale for granting the father custody during the school year was that this was most compatible with the mother's work schedule, and with her educational goal. The court also reasoned that since the children were attending the school at which the mother was teaching, she would have frequent opportunities to see them, even without custody.

---

[1]Tenn. Code Ann. § 36-6-401, et. seq. is a fairly recent enactment, which requires the incorporation of a detailed permanent parenting plan into any final decree of divorce where a minor child is involved. The criteria for the residential schedule in the plan overlap with, and somewhat expand upon, the factors set out in Tenn. Code Ann. § 36-6-106 for determination of custody.

During the hearing on the Motion to Alter and Amend, the mother testified to the contrary that she has had very little opportunity to interact with the children during the school day. She also complained that the court's current plan prevents her from driving the children to school in the morning, or taking them home in the afternoon. Instead, they have to ride the school bus. Thus, while the court's plan was based in large part on an attempt to solve scheduling problems, it may have created some new ones.

Ms. Hopkins also testified that she would only have to attend class one night a week during the school year to make normal progress towards her Masters Degree. It thus appears to us that it would be possible for her to attend the classes she needs, even while following a schedule that divides custody equally between the parties.

It is true that Tenn. Code Ann. § 36-6-404(15) states that the court can take each parent's employment schedule into account when fashioning a parenting plan, and may make accommodations consistent with those schedules. But there was no proof that the mother's custody had to be curtailed as severely as the court believed necessary in order for her to meet her professional and educational obligations.

In sum, we believe that the best interests of the children are most effectively served by a custody determination that divides their physical custody equally between the parents. The father submitted two plans to the court, in both of which the parties alternate custody on a weekly basis. We believe that his plan of June 3, 2002 is the one the court should have adopted.

Although some adjustments may be necessary to accommodate the mother's academic schedule, the parties can make such adjustments by informal agreement. If they cannot agree, then the plan provides for mediation by a Rule 31 Mediator. We note that the father's plan obligates him to pay child support of $800 a month, which we believe will equalize the resources available to the children, regardless of which parent they are with.

We also note that if we were to subtract the presumptively correct amount of support she would be obligated to pay under the child support guidelines from the amount he would have to pay under the same guidelines, the result would be very close to the amount he offered.[2] In light of the father's exercise of primary custody following the trial court's order, he should not be held responsible for any back child support, and his support obligation should begin in the month following the filing of this opinion.

## IV. THE PROPERTY DIVISION

---

[2]The figures break down as follows: the husband's gross income of $5596 per month ($67,154/12) is reduced under the guidelines to a net income of $3918 per month. As the father of three children, he would normally be obligated to pay 41% of that amount to the custodial parent for child support, or $1606. The mother's gross income of $2375 per month ($28,500/12) results in a net income of $1880 per month and 41% of that amount is $771 per month. Subtracting the mother's presumptive obligation from the father's leaves a difference of $835 per month.

## A. THE $17,000 DEBT

The appellant argues that the trial court invaded the authority of another court by approving an offset in the property division based upon a presumed outcome in a case still pending in the General Sessions Court. She contends that since that court had not yet decided whether the purported $17,000 debt to Mr. Hopkins' parents is in fact owed, it was error for the trial court to factor that sum into its calculations.

As the appellee points out, however, the trial court could not fully divide the marital property without also incorporating the marital debts. The court did state that it was making Mr. Hopkins responsible for the debt to his parents "so that the general sessions lawsuit is dismissed." But of course the court was not taking it upon itself to dismiss an action in another court, but merely observing that satisfaction of the debt would undoubtedly result in dismissal of the general sessions action.

Appellee also argues that since the divorce complaint was filed before the debt action, the divorce court took exclusive jurisdiction of the matter. We don't believe this is so, since Mr. Hopkins' parents are not parties to the divorce. We agree however that had the general sessions case gone to trial before the final order was filed in the divorce case, the defendants could have attempted to prevent the general sessions court from ruling on the debt by raising the defense of prior suit pending. In any event, despite the confusion that might have been created by putting the same debt at issue in two different cases, we agree with the appellee that it was proper for the trial court to rule on and dispose of the purported marital debt as it relates to the divorce of these parties.

## B. THE TOTAL PROPERTY DIVISION

The trial court is authorized to equitably divide the marital property of the parties, without regard to fault. *See Wilder v. Wilder*, 863 S.W.2d 707 (Tenn. Ct. App. 1992) "in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). The court is given wide discretion in property division. *Loyd v. Loyd*, 860 S.W.2d 409 (Tenn. Ct. App. 1993). Its distribution is given great weight on appeal, and is presumed to be correct, unless the preponderance of the evidence is otherwise. *Barnhill v. Barnhill*, 826 S.W.2d 443 (Tenn. Ct. App. 1991).

In the present case, the trial court attempted to divide the marital property equally between the parties, in light of the factors set out in Tenn. Code Ann. § 36-4-121(c). The factors supporting an equal division were the duration of the marriage, the physical and mental health of the parties, and their equal contribution "to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property," with the contribution of the wife as homemaker and parent given equal weight to the husband's contribution as wage earner and parent, as is required by Tenn. Code Ann. § 36-4-121(c)(5).

Synthia Hopkins notes that the relative economic circumstances of the parties at the time of the division of assets is also a factor to be considered. Tenn. Code Ann. § 36-4-121(c)(8). She

argues that the division of marital property as a whole was inequitable as to her, because Mr. Hopkins has a far greater earning capacity than she does. We agree that as a public school teacher, Ms. Hopkins is unlikely to ever earn as much as her former husband earns in the private sector, but we do not believe this automatically entitles her to a larger share of the marital estate.

We note that the parties do not appear to have accumulated very much in the way of financial assets during the course of their marriage, with the exception of the husband's 401(k). Nonetheless, the trial court's order gives the wife over $27,000 in cash, unencumbered by taxes. Although this award represents her share of the husband's 401(k), Mr. Hopkins cannot withdraw this sum from the 401(k) without incurring a 10% penalty and paying income taxes on it. Thus, the immediate impact of the property division will fall on him, while the immediate benefit will accrue to her.

The wife will also receive $10,000 as rehabilitative alimony over three years. Once she earns her Master's Degree, she will receive an immediate raise of $3,000 a year, with additional raises each year in accordance with the Clarksville Montgomery salary grid that was entered into evidence. There are no indications in the record that the husband can expect increases in his own salary.

In sum, it appears to us that while Mr. Hopkins' salary does place him at an advantage relative to his former wife, the differences between the economic circumstances of the parties are not so great as to render an equal division of the marital property inequitable. We therefore do not believe that the evidence preponderates against the trial court's decision.

### V. ATTORNEY FEES

Finally, Ms. Hopkins argues that the trial court erred in refusing to award her attorney fees. She points out that attorney fees are considered to be a type of alimony, *Raskind v. Raskind,* 325 S.W.2d 617 (Tenn. 1959); that as with all alimony awards, it is permissible to consider fault when ruling on the question of attorney fees; *see Lindsey v. Lindsey*, 976 S.W.2d 175 (Tenn. Ct. App. 1997); and that fault in this case clearly lies with Mr. Hopkins, since the wife was awarded the divorce on the grounds of his inappropriate marital conduct.

But it is also true that an award of attorney fees is within the discretion of the trial court, and will not be reversed without a clear showing of abuse of that discretion. *Loyd v. Loyd,* 860 S.W.2d 409 (Tenn. Ct. App. 1993); *Houghland v. Houghland,* 844 S.W.2d 619 (Tenn. Ct. App. 1992). Further, when there is a source of funds for a party to pay his or her own attorney fees, and those funds are not necessary for that party's support, it is usually not considered appropriate to make the opposing party responsible for such fees. *See Franklin v. Franklin*, 746 S.W.2d 715 (Tenn. Ct. App. 1987).

In the present case, Ms. Hopkins received over $27,000 as her share of the marital assets. She is a licensed teacher, who has been proven to be capable of supporting herself. Further, there is nothing in the record to indicate that the fees she incurred were out of the ordinary, or that Mr. Hopkins acted in an obstructive way to force her to pay for more legal assistance than she would

otherwise have required.  Thus, we believe that it was within the discretion of the trial court to decline to award attorney fees to her.

<h1 style="text-align:center">VI.</h1>

That part of the trial court's order which deals with child custody and child support is reversed.  All other parts of the order, including those which deal with the division of marital property and with attorney fees are affirmed.  Remand this cause to the Chancery Court of Montgomery County for further proceedings consistent with this opinion.  Divide the costs on appeal equally between the appellant and the appellee.


_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.