# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **STEPHEN LEWIS,** | ) | |
| | ) | **FILED** |
| Plaintiff/Appellee | ) | Montgomery Chancery No. 97-11-0024 |
| | ) | **July 27, 1999** |
| **v.** | ) | **Cecil Crowson, Jr.**<br>**Appellate Court Clerk** |
| | ) | Appeal No. 01A01-9809-CH-00469 |
| **STEPHANIE LEWIS,** | ) | |
| | ) | |
| Defendant/Appellant. | ) | |

### APPEAL FROM THE CHANCERY COURT OF MONTGOMERY COUNTY
### AT CLARKSVILLE, TENNESSEE

### THE HONORABLE CAROL A. CATALANO, CHANCELLOR

For the Plaintiff/Appellee:                         For the Defendant/Appellant:

F. J. Runyon, III                                            Carrie W. Kersh
Clarksville, Tennessee                              Clarksville, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This is a divorce and child custody case. The wife challenges the trial court's order awarding the husband custody of the parties' minor child, as well as the trial court's decision to grant the divorce to the husband on the grounds of inappropriate marital conduct. We affirm.

Appellant Stephanie Lewis ("Wife") and Appellee Stephen Lewis ("Husband") were married on June 8, 1991. They had one child, a daughter, Jaylin Lewis ("Jaylin"), born March 24, 1994. The record indicates that the parties had a tumultuous relationship.

In June 1997, Wife told Husband that she wanted a divorce. Husband testified that Wife asked for her share of the equity in the parties' home. After Wife showed Husband divorce "papers," Husband signed a check to her for $20,000, representing Wife's equity in the parties' home. Wife then gave Husband a quitclaim deed and moved out of the home for approximately five or six weeks, after which the parties apparently reconciled. Wife testified that she wanted a divorce but that she changed her mind. Wife said that Husband insisted that she move out of the home and only then did she ask for her share of the equity in the home.

On November 6, 1997, Husband filed for divorce, citing irreconcilable differences and inappropriate marital conduct. Later that same day, Wife filed a petition seeking an order of protection, based upon several incidents of alleged abuse by Husband. She obtained a temporary ex parte order of protection. On November 14, 1997, the trial court conducted a hearing regarding Wife's petition.

At the hearing on Wife's petition, Wife testified that on November 1, 1997, she, Husband, and Jaylin attended a basketball game. As they started to leave the game, Husband carried Jaylin down the bleachers. Jaylin became upset and began crying and "resisting" by kicking her legs. As Husband went down the bleachers with Jaylin, he slipped and almost fell. Jaylin continued crying, and Wife testified that Husband was very upset. They got in the car, with Husband driving and Wife and Jaylin in the back seat. Wife said that, once inside the car, Husband yelled at Jaylin and slammed on the brakes and caused Wife and Jaylin to be thrown forward, pinning Jaylin's foot against the frontseat of the vehicle.

At the hearing, Husband recalled the incident differently. He testified that Jaylin climbed up and down the bleachers acting like a "three year old" when Wife said that she was "tired of dealing with this" and that she wanted to leave. Husband testified that he almost lost his balance while carrying Jaylin down the bleachers because Jaylin began crying and kicking. Husband

testified that Jaylin was crying in the car on the way home from the game, and Wife started yelling at Jaylin. After asking Wife and Jaylin to calm down, Husband "tapped" the brakes prior to approaching a stop sign. Husband denies slamming on the brakes causing Wife and Jaylin to be thrown forward.

At the hearing, Wife testified to another alleged incident of abuse several days later, on November 5, 1997. Wife testified that she and her mother, Glenda Shoop ("Shoop"), and Jaylin went to the grocery store. When they left the grocery store, Jaylin refused to sit in her car seat. Once they returned home, Wife put Jaylin in "time-out." Husband then got home from work and asked Wife what had happened. Wife admitted walking past Husband and responding with an obscene gesture. Wife testified that Husband then began yelling "in that threatening tone" at Shoop in the kitchen. Before she knew it, Wife said she grabbed a knife. Wife stated that she said, "[p]lease don't hurt my mom." After "realizing" that she had a knife in her hand, Wife testified that she placed the knife on the counter and called 911. Wife reported to the 911 operator that Husband was threatening her. Shoop testified that Husband became angry, began "yelling" at her, and allegedly slapped Shoop on the hand.

Husband also recalled this incident differently. He testified at the hearing that he returned home to find Jaylin in "time-out." Husband asked what had happened. Husband testified that Wife responded with an obscene gesture, so Husband asked Shoop what had happened. Shoop stated, "what the hell do you care?" Husband testified that Wife then grabbed a kitchen knife and held it three inches from his face. Husband denied threatening or slapping Wife or Shoop.

After hearing the conflicting testimony, the trial court addressed the alleged incidents of violence:

> [In addressing November 1, 1997, incident,] [t]he Court . . . find[s] that apparently this child is a high maintenance child. And because she is that, these parties have had several disagreements so far as her discipline and keeping up with her is concerned. It's a big responsibility and it does require that both of them do what they can.
> The Court does not find that the incident on November 1, 1997[,] constitutes a threat of harm to this child or to Mrs. Lewis. Therefore, apparently, Mrs. Lewis didn't think so either. There was no application for peace bond then . . . .
> On November 5th, Mrs. Lewis alleges in her peace bond application that on Wednesday night November 5th, Steve Lewis struck my mother on the hand and verbally threatened her. The order of protection application does not even relate [to] any threat to Mrs. Lewis herself.
> And the Court finds that on November 5th Mr. Lewis did not threaten Mrs. Lewis in any way. Rather that Mrs. Lewis threatened him with a knife and that his mother-in-law was being confrontational . . . .

> [T]he Court finds the following facts: [t]hat on November 6th 1997[,] Mr. Lewis filed a petition for divorce. On November 6th -- before this order of protection -- Mr. Lewis was asking his attorneys to provide for him to have custody of his child.
> But . . . November 6th is the same day that Mrs. Lewis comes and gets this application for an order of protection. And it more appears that she obtained it because of what Mr. Lewis was in the process of doing more than anything else . . . .

Thus, the trial court denied Wife's petition for an order of protection.

On March 23, 1998, the same trial judge heard the divorce proceedings. The trial court refused to hear evidence concerning alleged violent incidents occurring from November 1, 1997, to November 5, 1997, because the proof was previously presented at the hearing on Wife's petition for an order of protection.

In the divorce proceedings, Wife testified to several incidents of violence which allegedly occurred during the course of the marriage. Wife testified that the abuse began the first week of their marriage when Husband yelled at her, pushed her, placed her in a "headlock" and "took her down to the ground . . . ." Several months after this incident, the parties were lying in bed arguing when Husband allegedly again placed her in a "headlock." Wife testified to a third incident on July 3, 1995, when the parties began arguing and Wife pointed her finger in Husband's face, and Husband grabbed Wife's finger. Wife ran to the bedroom and closed the door. Wife said Husband then "broke through" the door. Wife testified that: "[w]e were just both looking at the door. We couldn't believe it. We had to spend the rest of the day piecing it back together." Wife also testified that Husband pulled her hair on several occasions. Wife also contends that, in March 1997, Husband kicked her while the parties were in bed, and Wife slapped Husband. Wife admitted that she did not tell anyone of Husband's alleged abuse. Wife admitted assaulting Husband. Wife also admitted slapping Glenda Lewis, her mother-in-law, causing her to fall to the ground.

In his testimony, Husband denied any violent behavior, although Husband admitted grabbing Wife's hair on two occasions. Husband testified that Wife hit, slapped, and kicked him. Husband said that the parties frequently argued about money "[a]nd she would get up in my face. She'll point, she'll curse, and then turn around and storm off . . . ." Husband testified that Wife cut his ear with a key on one occasion and placed a knife to his throat, referring to the November 5th incident.

Glenda Lewis, Husband's mother, testified regarding the incident in which Wife slapped her and made her fall to the ground. Glenda Lewis testified that Wife had a "crazed" look in her eye.

In the divorce proceedings, both parties claimed to be Jaylin's primary caregiver. Prior to the marriage, Husband obtained a college degree. At the time of trial, Husband was employed in the banking industry. Wife attended the same college and obtained a degree in psychology and sociology. Wife pursued jobs in the behavioral sciences field but was unsuccessful because prospective employers indicated that Wife needed a master's degree. Wife chose not to obtain a graduate degree and had several jobs before accepting a position at a bank.

Subsequently, Wife became pregnant. For two months after Jaylin's birth, Wife stayed home to care for the child. Wife then began working part-time at a bank. While Wife was at work, Glenda Lewis cared for Jaylin. Once Jaylin reached two years old, she attended a daycare center while Wife continued to work on a part-time basis. Wife testified that she cares for Jaylin when Husband travels out of town on business trips. Wife said that she and Jaylin share a "typical mother/daughter" relationship, and that Jaylin is the most important priority in her life.

Husband testified that he was Jaylin's primary caregiver. Husband said that he was the parent responsible for disciplining Jaylin and that he explained to her behaviors that were considered bad, as well as the consequences of such behavior. Husband testified that he took care of Jaylin in the mornings before leaving for work and particularly on weekends. Husband said that Jaylin enjoys many activities with him such as visiting his parents and "running errands" on the weekends. Husband enrolled Jaylin in dance classes and brings her to dance class every Friday. Husband also enrolled Jaylin in a private school.

Sherry Phillips ("Phillips"), a friend of the parties, testified that Wife had difficulty controlling Jaylin and that Jaylin "seem[ed] more disciplined and happy with Steve." Phillips also said that Husband brought Jaylin to the majority of the birthday parties given for other children. Cynthia Ginsburg, a neighbor of the parties, testified that she observed Husband playing with Jaylin in the front yard and taking walks with her around the neighborhood.

Prior to the divorce proceedings, Wife signed a marital dissolution agreement, which was later withdrawn, giving custody of Jaylin to Husband. In her testimony, Wife said that Husband

4

promised to attempt a reconciliation in return for custody of Jaylin. Rhonda Byard ("Byard"), a friend of the parties, testified that Wife told her that she was considering giving Husband custody of Jaylin. The record showed that lengthy negotiations occurred between the parties regarding several provisions of the marital dissolution agreement.

After hearing the evidence, the trial court found the following facts:

> The Court finds that [Wife] has conducted herself in an inappropriate way, and grants [Husband] a divorce on the grounds of Inappropriate Marital Conduct, T.C.A. Section 36-4-102. The impetuous conduct that was related in Court included slapping her mother-in-law, holding a knife to her husband, and cutting her child's rabbit bank open to obtain a small amount of money for postage.
>
> This same conduct applies to [Wife's] signing of the Marital Dissolution Agreement. [Wife] testified that the only reason she signed the Marital Dissolution Agreement was because [Husband] had said that he would not reconcile or try again to save their marriage unless he had custody of their daughter.
>
> Witnesses testified in open Court that [Wife] had talked about giving custody of the parties' minor child to [Husband], and that [Wife] had prayed with one of her friends about not signing the Marital Dissolution Agreement which gave custody of the parties' minor child to [Husband]. The Court finds that [Wife] could have been thinking at that time of the relationship between [Husband] and their daughter, and what a good relationship they have together. The Court finds that [Husband] does have a good relationship with the parties' minor child, a relationship which includes a practice of making "deals" for her behavior and "pinky promises" when the deal is important. The Court further finds that [Husband] tells his child face to face what he considers is wrong or bad behavior, and that he is willing to "pop" his child for discipline. The Court finds that [Husband] has made a routine of activities with the parties' minor child. . . . The Court finds that [Husband] has enrolled the child in dance, and consistently been the parent to take her to dance. The Court finds that [Husband] has enrolled the child in the Academy. The Court finds from Ms. Price, of Kiddie College, that . . . [Wife] seems to usually be in more of a hurry when picking up the child, even though she has adjusted her schedule to only be working part-time in order to have more time for the child. The Court finds that neighbors testified that . . . after observing both [Husband] and [Wife] with their child, the neighbors observe [Husband] as being the more patient parent, and that the child seems happier with [Husband].
>
> The Court finds that these could be some of the reasons why [Wife] was willing to give [Husband] custody of their daughter when she executed the Marital Dissolution Agreement.
>
> Based on the testimony presented, the Court finds that it is in the best interest of the child that custody be awarded to [Husband].

Thus, the trial court awarded the divorce to Husband and awarded Husband custody of Jaylin. The trial court also divided marital property and did not grant Wife alimony. From this order, Wife now appeals.

On appeal, Wife argues that the trial court erred in granting Husband a divorce on the ground of inappropriate marital conduct. Wife argues that the trial court erred in excluding testimony regarding incidents of violence to which Wife testified at the hearing on her petition for an order of

protection. Wife contends that the evidence preponderates against the trial court's award of custody to Husband and that the trial court utilized the award of custody to punish Wife.

In child custody cases, appellate review is *de novo* upon the record, with a presumption of the correctness of the trial court's factual findings. *See* Tenn. R. App. P. 13(d); ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984); ***Dalton v. Dalton***, 858 S.W.2d 324, 327 (Tenn. App. 1993). No such presumption attaches to the trial court's conclusions of law. ***Carvell v. Bottoms***, 900 S.W.2d 23, 26 (Tenn. 1995).

Wife asserts that the trial court erred in refusing to allow evidence of the incidents of violence upon which the petition for an order of protection was based. She contends that the evidence preponderates against the trial court's order awarding the divorce to Husband on the grounds of inappropriate marital conduct, and argues that the evidence revealed that Husband was the aggressor and that Wife was afraid of Husband.

Wife first argues that the trial court erred in excluding from the divorce trial evidence on the incidents of violence to which the parties testified during the hearing on Wife's petition for an order of protection. The trial court has wide discretion in admitting or excluding evidence and will be reversed on appeal only upon on showing of abuse of discretion. ***See Otis v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 442 (Tenn. 1992); ***Davis v. Hall***, 920 S.W.2d 213, 217 (Tenn. App. 1995). In this case, the same trial judge heard testimony on the alleged incidents of violence from November 1, 1997, to November 5, 1997. At the hearing, the parties testified fully about those alleged incidents. ***See Winchester v. Winchester***, No. 02A01-9802-CV-00046, 1999 WL 250176 (Tenn. App. Apr. 28, 1999). Wife points to no prejudice from this decision; indeed, further testimony on the same incidents would have been redundant and unnecessary. We find no abuse of discretion in the exclusion of evidence about facts already presented before the court. The trial court's decision on this issue is affirmed.

Wife also contends that the evidence preponderates against the trial court's decision to award the divorce to Husband on the grounds of inappropriate marital conduct, and argues that the evidence shows that Husband was the aggressor and that Wife was afraid of him. In awarding the divorce to Husband, the trial court characterized Wife's conduct as "impetuous," noting several incidents, including "slapping her mother-in-law, holding a knife to her husband, and cutting her child's rabbit bank open to obtain a small amount of money for postage." These incidents were not disputed by

6

Wife. Most of the remaining incidents were sharply disputed by the parties, with their testimony in stark contrast. The trial court's findings on these incidents depended squarely on its assessment of the parties' credibility and demeanor in court. A trial court's determination of credibility is entitled to great weight on appeal primarily because the trial court had the opportunity to observe witnesses as they testified. *Gaskill v. Gaskill*, 936 S.W.2d 626, 633 (Tenn. App. 1996); *see Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. App. 1995); *Koch v. Koch*, 874 S.W.2d 571, 577 (Tenn. App. 1993). Considering the undisputed evidence, and with appropriate deference to the trial court's determination of credibility on the disputed evidence, we find that the evidence does not preponderate against the trial court's decision to award the divorce to Husband. The trial court is affirmed on this issue.

Wife also contends that the trial court erred in awarding custody of Jaylin to Husband, arguing that the trial court did not give proper weight to the fact that she had been Jaylin's primary caregiver during the marriage. She argues that custody was awarded to Husband in order to punish her.

In addressing the custody issue, we recognize that "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill*, 936 S.W.2d at 631; *see also Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. App. 1997). The trial court is in the better position than this Court to observe the parties' demeanor and determine their credibility. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). "Since [child custody] decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility." *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. App. 1997) (citing *Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. App. 1988)).

Tennessee Code Annotated § 36-6-101(a) requires that custody of children in divorce be determined "as the welfare and interest of the child or children may demand." Tenn. Code Ann. § 36-6-101(a) (Supp. 1998). In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. App. 1983), the Court set forth a common sense approach to determining custody, the doctrine of "comparative fitness." The *Bah* Court noted that "[t]he paramount concern in child custody cases is the welfare and best interest of the child." *Bah*, 668 S.W.2d at 666; *see also Ruyle v. Ruyle*, 928 S.W.2d 439, 441 (Tenn. App. 1996); *Koch*, 874 S.W.2d at 575. This determination depends on the facts of each case. *Koch*, 874

7

S.W.2d at 575.  Tennessee Code Annotated § 36-6-106 sets forth some of the factors to be considered in performing a comparative fitness analysis.  These factors include:

> (1) The love, affection and emotional ties existing between the parents and child;
>
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . .
>
> (4) The stability of the family unit of the parents;
>
> (5) The mental and physical health of the parents;
>
> (6) The home, school and community record of the child;
>
> (7) The reasonable preference of the child if twelve (12) years of age or older.  The court may hear the preference of a younger child upon request.  The preferences of older children should normally be given greater weight than those of younger children;
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . .
>
> (9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.
>
> (10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106 (Supp. 1998).  In this case, the parties disputed which parent had been Jaylin's primary caregiver during the marriage, and the trial court made no finding on this issue.  However, even assuming that Wife had been Jaylin's primary caregiver during the marriage, the trial court appropriately considered the evidence on the parties' behavior, alleged abuse, and emotional stability.  The trial court noted Wife's "impetuous" conduct, including "slapping her mother-in-law, holding a knife to her husband, and cutting her child's rabbit bank open to obtain a small amount of money for postage."  The trial court credited Husband's testimony on the disputed incidents of alleged abuse, and questioned Wife's motives in seeking an order of protection after Husband filed for divorce.  As noted in *Barnhill v Barnhill*, "[c]ustodial arrangements should not be made with the goal of punishing a parent for misconduct.  Nonetheless, misconduct of a party does often reflect fitness of the parent for custody and is a proper consideration."  *Barnhill v Barnhill*,  826 S.W2d 443, 453 (Tenn. App. 1991) (citing *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. App. 1973).

Considering the undisputed evidence, and giving appropriate deference to the trial court's credibility determinations on the disputed evidence, we find that the evidence does not preponderate against the trial court's award of custody of the parties' child to Husband.

The decision of the trial court is affirmed. Costs are assessed against the Appellant, for which execution may issue if necessary.

 

_____
**HOLLY KIRBY LILLARD, J.**

_____
**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**