# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs June 25, 2001 Session

## JERRY BROOKS v. MELISSA TERRY IBSEN, ET AL.

**Appeal from the Chancery Court for Union County**
No. 3605    Billy Joe White, Chancellor

**FILED AUGUST 24, 2001**

**No. E2000-02870-COA-R3-CV**

Jerry Brooks ("Plaintiff") contracted with Joe Ibsen d/b/a Century Wholesale Pool Supply, Inc. ("Defendant"), for the installation of a swimming pool. Plaintiff received a limited warranty. After the swimming pool developed several cracks and the parties could not reach agreement on the proper way to repair the pool, Plaintiff had the pool repaired in the manner recommended by an engineer he had retained. This lawsuit followed. The Trial Court awarded Plaintiff $61,531.28 in damages. We reduce the judgment to $51,371.28 and affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Steven G. Shope, Knoxville, Tennessee, for the Appellants Melissa Terry Ibsen, Joe Ibsen d/b/a Century Wholesale Pool Supply, Inc., and Century Pool Supply Company.

David H. Stanifer, Tazewell, Tennessee, for the Appellee Jerry Brooks.

# OPINION

## Background

Plaintiff contracted with Defendant for the purchase and installation of a swimming pool. Plaintiff received a limited warranty wherein Defendant guaranteed "all pool work to be free from defect for one year from date of completion when subject to normal use and care . . . ." Defendant agreed to remedy "any breach without charge." Plaintiff began experiencing problems with the swimming pool shortly after completion, eventually resulting in this lawsuit. In his complaint, Plaintiff alleges breach of contract and a violation of the Tennessee Consumer Protection Act.

Plaintiff testified that the contract price for the pool was approximately $36,960, but that he had additional work done which put the price over $40,000.00. All payments were made to Defendant except the final payment of $3,660.00. According to Plaintiff, before he and his family even used the pool, they noticed several cracks which Plaintiff estimated to be a total of 100 lineal feet. The following weekend, Defendant went to Plaintiff's residence to inspect the pool. At that time, Defendant believed that the cracks were in the outer plaster surface and not in the underlying concrete. Defendant told Plaintiff he would take care of the problem. Plaintiff and his architect met with Defendant and an agreement was worked out on how to fix the pool. The agreement provided, in relevant part, that at the end of the summer, the cracks and any leaks would be repaired. If plaster crack repairs were not acceptable to Plaintiff, an epoxy coating would be provided at no additional cost. While Defendant originally believed the cracks were not in the gunite and only affected the outer plaster, the agreement stated that the gunite would be inspected for cracks when the repairs were undertaken.

According to Plaintiff, when the pool eventually was inspected, it was determined that the cracks went through to the gunite. Plaintiff gave Defendant permission to begin repairing the pool. Defendant continued to assure Plaintiff the problem would be resolved. While Defendant was in the process of replacing the pool bottom, but before the new concrete had been poured, Plaintiff had some concerns about how the pool was being repaired. Plaintiff's architect inspected the pool and recommended that Plaintiff contact "someone else." Plaintiff then contacted Jack Llewellyn ("Llewellyn"), an engineer with Foundation Systems Engineering, P.C. Llewellyn did not agree with Defendant on the proper way to repair the pool. Llewellyn's proposed method for repairing the pool was much more expensive. Plaintiff then sent a letter to Defendant inviting him to obtain the services of an engineer. Plaintiff also suggested that if Defendant did obtain the services of an engineer, and the two engineers could not reach an agreement on how to proceed, then the two engineers could select a third engineer to resolve the matter.

When the parties were unable to reach an agreement on what was necessary to repair the pool properly, Plaintiff obtained two estimates and had the pool repaired according to the recommendation of Llewellyn, utilizing the company that gave the lower estimate. Llewellyn had some concerns about movement in the walls of the pool and recommended that the pool be

completely redone.  In order to reduce the cost of having the walls of the pool torn out and replaced, Plaintiff had a new pool installed over the old pool, resulting in a somewhat smaller pool.  Plaintiff also incurred some excavation costs because dirt needed to be hauled off once the original pool bottom was removed.  The contract price to have the new pool installed over the old pool was $32,236.00.  The excavation costs were $10,136.89, which included having the dirt removed.  Plaintiff also paid Llewellyn a total of $16,658.44.  According to Plaintiff, this was for "all of their total engineering systems and design work, everything that they did towards finding the problem and making recommendations for rebuilding the pool, and studies.  I think they did some core drilling."  Plaintiff's architect was paid $3,931.05.  Plaintiff also incurred $1,003.94 in expenses for the purchase and installation of a pool shower and faucet as called for in the original contract with Defendant but which had not been installed.  Plaintiff also spent $282.39 for electrical work which Defendant never completed.  Plaintiff further claimed that he had to replace part of the concrete deck because of cracking and had other parts of the deck reworked because it was defective, which cost an additional $4,008.95.  Plaintiff's total claimed damages were $68,257.66, excluding his claim for attorney fees.

At trial, Defendant stipulated that Llewellyn was a licensed engineer and qualified as an expert.  Llewellyn testified that he specializes in geo-technical soils and foundations.  Llewellyn tested the soil the day before the concrete was to be poured by Defendant in hopes of repairing the pool.  Llewellyn stated that the soil was soft in consistency and was not suitable to support a concrete slab.  According to Llewellyn, a portion of the pool was bearing directly on the soft soil and had settled, causing the cracks to develop with resulting water loss.  Llewellyn testified that Plaintiff needed to either completely remove and replace the pool, or build a new pool inside the existing pool.  Regardless of which option was chosen, he felt that the soft soil would have to be removed or the same problem would develop again.  Llewellyn also concluded that the walls of the original pool were not thick enough, and he believed the pool walls may have moved.  Merely patching or reinforcing the existing walls would not be sufficient due to the inadequate design of the walls.  Llewellyn testified that he disagreed with several of the recommendations made by Defendant's expert, Mr. R.A. Nack ("Nack")[1].  For example, Nack proposed underpinning only a section of the pool with rock, which would have resulted in a portion of the pool being on rock and another portion on soil.  This could result in more cracks because the pool would settle differently if it rested on two different surfaces.

Defendant testified that initially he believed the cracks were cosmetic.  Once the pool started losing water, however, he knew the cracks were in the concrete bottom.  Defendant does not know what caused the cracks in the pool.  Defendant has repaired cracks in swimming pools on numerous occasions.  The procedure he uses to repair cracks is to cut back the plaster to determine if the cracks extend down to the gunite.  Then he would drill or cut down into the crack, fill it with hydraulic cement, and replaster over the cement.  This is the method he intended to utilize to repair Plaintiff's pool.  Defendant stated that he was to the point where the new cement was about to be

---

[1]Mr. Nack was not called as a witness at trial, although a letter containing his recommendations was admitted at trial over the objection of Plaintiff.

poured when Plaintiff stopped him from completing the repairs because Plaintiff wanted to have soil samples made. Once this was completed, Defendant met with Plaintiff and Llewellyn. Plaintiff indicated that he wanted to "tear that pool out" in accordance with Llewellyn's recommendation, but Defendant refused. Defendant then obtained a recommendation from Mr. R.A. Nack with R.A. Nack & Associates, an architectural and engineering firm based in Carbondale, Illinois. Nack disagreed with Llewellyn on how to repair the pool and concluded that, for the most part, he agreed with how Defendant wanted to repair the pool. Defendant testified that he was at all times willing to repair the pool and could have properly repaired the cracks utilizing the method which he and Nack thought was appropriate. Defendant admitted that Nack never inspected the pool. Defendant also acknowledged that there were a few items in the original contract which had not been completed, such as installing a drain and frost proofing the pool.

Mr. Bill Campbell ("Campbell") was called as a witness for the Defendant. Campbell is the owner of Campbell's Pool and Spa and has built in excess of two thousand swimming pools. Campbell has also repaired cracks in swimming pools. Campbell claimed that the normal procedure to repair a crack is to cut out the affected area and, if necessary, take out the steel and replace that as well. Campbell agreed with Defendant on the proper procedure in which to repair Plaintiff's pool. He claimed he has never completely torn out a pool in order to repair a crack. Campbell admitted he never inspected Plaintiff's pool, and he does not know what caused the cracks.

Defendant also called as a witness Mr. Bill Belcher ("Belcher"), owner of Castlerock Pools. Belcher has built two to three hundred swimming pools and also has repaired swimming pools. Belcher testified that when repairing cracks, he normally cuts out the part that is cracked and then replasters the affected area. He admitted, however, that the manner in which a crack is repaired depends on the severity of the crack(s). Belcher further admitted he never inspected Plaintiff's pool, and he does not know what caused the cracks.

After a bench trial, the Trial Court awarded judgment to the Plaintiff in the amount of $61,531.28. The Trial Court simply stated in its Judgment that the "evidence preponderates in favor of the contentions of the Plaintiff." The damages awarded to Plaintiff were broken down as follows:

Sequoyah Pools

| | |
|---|---|
| Original Contract | $ 32,236.00 |
| Excavation Cost and Hauling Dirt | 5,500.00 |
| Foundation Systems | 10,000.00 |
| Design Innovations | 2,000.00 |
| Bradley Pool Shower | 690.05 |

| | |
|---|---|
| Bradley Frost Proof Faucet | 313.89 |
| Roy Cinnamon Electrical Work | 282.39 |
| Cool Deck Defect | 4,008.95 |
| Attorney Fees and Expenses | 6,500.00 |
| TOTAL: | $ 61,531.28 |

### Discussion

On appeal, Defendant makes two arguments. First, he claims that he stood ready to repair the pool but Plaintiff stopped him from completing those repairs. Defendant argues that this should prevent Plaintiff for recovering any judgment. Second, Defendant argues that he could have repaired the pool for $7,500.00, and any judgment should be limited to that amount because Plaintiff had a duty to mitigate his damages.

A review of findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d 403, 404 (Tenn. 1999). Review of questions of law is *de novo*, without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999). Initially we point out that Defendant claims on appeal that "[b]ecause the trial court failed to make any specific findings of fact, this Court's analysis of this case must include a review of the full record to determine the preponderance of evidence." Plaintiff attached to his brief a Memorandum Opinion and Findings of Fact made by the Trial Court immediately following the trial. Unfortunately, this Memorandum is not included in the record so it cannot be considered on appeal. Nevertheless, Defendant's claim that the Trial Court failed to make specific findings of fact is inaccurate.

Addressing the merits of the appeal, it is clear that a warranty was provided and Plaintiff was experiencing some significant problems with the new pool. The problems were such that Plaintiff believed he needed to hire an engineer to evaluate whether Defendant's suggested manner in which to repair the pool was proper. Llewellyn concluded that the walls of the pool may have moved and that further cracks could develop if the pool was repaired in the manner suggested by Defendant. Although the Trial Court's findings of fact are not properly before this Court, it is implicit in the Trial Court's judgment that he credited the testimony of Llewellyn regarding what was necessary to repair the pool properly and that Defendant's suggested course was not the proper manner in which to proceed. The Trial Court had the opportunity to observe the manner and demeanor of the various witnesses and assess their credibility. This determination will be given great weight on appeal. *See Barnhill v. Barnhill*, 826 S.W.2d 443, 448 (Tenn. Ct. App. 1991)(citing

*Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959)). After reviewing the record in its entirety, we cannot say that the Trial Court erred when it concluded that the "evidence preponderates in favor of the contentions of the Plaintiff."

Because the preponderance of the evidence does not weigh against the Trial Court's findings and the resulting judgment, it necessarily follows that Plaintiff is not limited to what the repairs would have cost had Defendant been allowed to proceed with simply replacing the bottom of the pool. Plaintiff was, therefore, entitled to damages based on what it actually cost him to repair the pool. The purpose of assessing damages in a breach of contract case is to place the plaintiff, as nearly as possible, in the same position he would have been in had the contract been performed. *Adams TV of Memphis, Inc. v. Comcorp of Tennessee, Inc.*, 969 S.W.2d 917, 922 (Tenn. Ct. App. 1998); *Action Ads, Inc. v. William B. Tanner Company, Inc.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979). The injured party, however, is not to be put in a better position than he would have been in by recovery of damages for breach of the contract. *Adams TV*, 969 S.W.2d at 922. It is undisputed in this case that Plaintiff did not make the final payment of $3,660.00, which is just under ten percent of the original contract price. Had there been no breach of the warranty, Plaintiff would have paid the entire $36,690.00 for the pool, not just $33,030.00. We therefore reduce the judgment awarded to Plaintiff by $3,660.00 so that Plaintiff is not placed in a better position than he would have been had there been no breach.

It is a general rule in this State that litigants must pay their own attorney fees in the absence of a statutory provision or a contractual agreement between the parties. *Morrow v. Bobbitt*, 943 S.W.2d 384, 392 (Tenn. Ct. App. 1996). The contract between the parties in this case does not provide for Plaintiff to be awarded attorney fees in the event of a breach. We must assume that the Trial Court awarded Plaintiff $6,500.00 in attorney fees pursuant to his claim under the Tennessee Consumer Protection Act, which contains a provision for awarding attorney fees to a successful litigant. Tenn. Code Ann. § 47-18-109(e)(1). After reviewing the record, we find that the preponderance of the evidence weighs heavily against any finding of a violation of the Tennessee Consumer Protection Act. Although the Trial Court did not explicitly state that there was a violation of this Act, to the extent that the Judgment can be so interpreted, we vacate that portion of the Judgment as well as the award of $6,500.00 in attorney fees.

We note that the Trial Court in its determination of the damages awarded Plaintiff did not allow the full amounts paid by Plaintiff to his engineer and architect. The record does not preponderate against the Trial Court's findings as to the amount of these and the other damages awarded to Plaintiff, other than as modified in this Opinion.

## Conclusion

We modify the Judgment of the Trial Court to reflect an award to Plaintiff in the amount of $51,371.28. As modified, the Judgment of the Trial Court is otherwise affirmed. This case is remanded to the Trial Court for further proceedings as may be required, if any, consistent with this Opinion, and for collection of costs below. Costs of appeal are taxed 75% to the Appellants

Melissa Terry Ibsen, Joe Ibsen d/b/a Century Wholesale Pool Supply, Inc., and Century Pool Supply Company, and 25% to the Appellee Jerry Brooks.

_____

D. MICHAEL SWINEY, JUDGE