**Nicole Marie Lusch BUSS–FLINN**

v.

**James Michael FLINN.**

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

April 1, 2003 Session.

May 14, 2003.

Permission to Appeal Denied by
Supreme Court Oct. 27, 2003.

Johnny V. Dunaway, LaFollette, Tennessee, for the Appellant James Michael Flinn.

Philip R. Crye, Jr., Clinton, Tennessee, for the Appellee Nicole Marie Lusch Buss–Flinn.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Nicole Marie Lusch Buss–Flinn ("Mother") filed a Complaint for Divorce in the General Sessions Court for Campbell County. In the complaint, Mother sought, *inter alia*, a divorce from James Michael Flinn ("Father") as well as primary residential custody of the parties' minor daughter. After Mother and daughter moved to Anderson County and Father moved to Roane County, Father filed a request to have the case moved to Anderson County pursuant to Tenn.Code Ann. § 36–5–3004. The Trial Court denied Father's request for a transfer. After a trial on the merits, the Trial Court granted Mother a divorce based on Father's inappropriate marital conduct and designated Mother as the primary residential parent of the child. Father appeals, claiming the Trial Court erred in not transferring the case to Anderson County, in granting a divorce to Mother, and in not awarding him coequal parenting time. We affirm.

## Background

Mother filed a Complaint for Divorce in the General Sessions Court for Campbell County in May of 2001. The parties resided together in Campbell County at the time of separation. Father still lived in Campbell County when the Complaint was filed. Mother and the parties' five month old daughter had moved to Anderson County by that time. Both parties had been married once before, and Mother had one child, a daughter, from the previous marriage. As grounds for divorce, Mother claimed Father was guilty of inappropriate marital conduct. Alternatively, Mother asserted that irreconcilable differences had arisen between the parties. Mother sought primary residential custody of the minor child and filed a proposed Parenting Plan which provided to Father what Mother considered appropriate visitation.

Father's answer to the complaint denied that he engaged in any inappropriate marital conduct or that irreconcilable differences had arisen between the parties. Father further denied that Mother was entitled to primary care and custody of their child, asserting both he and Mother were fit and proper persons to care for the child. Father sought "equal co-parenting" time. Approximately six months after answering the Complaint, Father filed a counterclaim for divorce, asserting Mother was guilty of inappropriate marital conduct or, alternatively, that irreconcilable differences had arisen between the parties.

Father was represented by counsel when Father's answer and counterclaim were filed. By April of 2002, Father was unemployed, was no longer represented by counsel, and was living in Roane County. Acting *pro se*, Father filed a motion seeking to have the divorce proceedings transferred from Campbell County to Anderson County pursuant to Tenn.Code Ann. § 36–5–3004. Mother objected to the transfer, arguing Tenn.Code Ann. § 36–5–3001 *et seq.*, applies only to the transfer of cases involving the enforcement or modification of an existing judgment concerning child custody and support. Since there was no such judgment in the present case, Mother

argued the divorce proceedings could not be transferred pursuant to that statute. The Trial Court agreed with Mother and denied Father's motion to transfer.

A trial was conducted on July 17 and 18, 2002. The Trial Court later issued a memorandum opinion from the bench which was transcribed and incorporated into the final judgment. The Trial Court granted a divorce to Mother based on Father's inappropriate marital conduct and designated Mother as the primary residential parent of the minor child. Father was granted visitation every other weekend, alternating holidays, three days over the Christmas holiday, and every other spring break when the child is of school age.

Father did not have a court reporter present when the case was tried in the General Sessions Court. He did, however, tape record most of the trial. For appeal purposes, Father had the tapes transcribed. Unfortunately, various portions of the recordings were unintelligible and some of the testimony was not recorded at all for one reason or another. Since the transcript was not a substantially verbatim recording of the proceedings as set forth in Tenn. R.App. P. 24(b), Father submitted the transcript as a "Statement of the Evidence" under Tenn. R.App. P. 24(c). Mother made no objections to the transcript, such as it is. We will, therefore, accept the transcript as a Statement of the Evidence, even though an incomplete one, and discuss only that testimony which pertains to the issues on appeal.

Mother's Aunt ("Aunt") testified she lives in a four bedroom house in Anderson County with her husband, Mother, and Mother's two daughters. Mother is cur-

rently working in Aunt's home running errands for Aunt and Aunt's husband, as well as cooking and cleaning. In return for these services, Mother "has a home. . . . [I]f something goes wrong with her car we take care of that. We make sure that her and her children are fed and clothed." Mother is with her children 24 hours a day, except when Father is exercising visitation with his daughter. Aunt testified Mother has a wonderful relationship with her children. Mother's first daughter also has a wonderful relationship with her younger sister. Aunt recalled an incident where Father brought his daughter back to Aunt's home after exercising visitation. The young child was wearing paper towels instead of a diaper.[1]

Mother testified that after filing the complaint for divorce, she attended and completed a parenting class as instructed by the Trial Court.[2] According to Mother, approximately three months prior to trial, she was in the process of enrolling her older daughter in kindergarten. Mother was having problems figuring out how she was going to provide her older daughter transportation to kindergarten given Mother's work schedule. She also was concerned about how she was going to make sure her older daughter was taken care of on days Mother was working and the child was sick. Mother and Aunt then began talking about whether it economically was feasible for Mother to continue working. If Mother continued to work, she would have to pay for daycare and would be unable to help out as much around the house, etc. Another concern of Mother's was Father's sudden and unannounced visits to his daughter's daycare.

1. Aunt's testimony suddenly ends at the bottom of page 85 of the transcript, in the middle of Father's cross-examination. Page 86 picks up with Mother's direct examination and it obviously is not at the beginning of her testimony.

2. It appears Father also completed a parenting class.

Eventually, Mother resigned from her job and stayed home with her daughters.

Mother and Father were married on March 10, 2000, and they separated approximately 48 days later. Mother testified to several events which she claims took place shortly after they were married and while she was pregnant with the parties' daughter. According to Mother, one day she was working on the computer trying to help Father locate some information. Mother stated she "didn't click on to the thing right", and Father got upset. She called him a "butthead." Father then "hit the keyboard and kicked the chair and left the house with a couple of beers." This occurred in front of Mother's older daughter. Mother recalled another incident where Father threw a frying pan containing an egg onto the kitchen floor. Father then threw a jar of Miracle Whip onto the floor, followed by a jar of honey. This scared Mother's older daughter. Mother then left the premises and took her daughter to a motel. When she returned three days later, the frying pan, egg, Miracle Whip, and honey were still on the floor. Thereafter, Father made comments that if any child of his told him "no," he would "pop them in the mouth." Mother also testified to an incident where Father used profanity around her older daughter. In another incident, Mother and Father were arguing and Father proceeded to take clothes out of the dryer and throw them on the floor and tell Mother if she wanted the clothes dried, she could dry them someplace else. Mother returned the clothes to the dryer and Father again took them out telling her if she wanted them dried to go someplace else. He also told her if she did not get her "slop" out of his frying pan, he would throw the frying pan onto the floor as well. Mother once again took her older daughter to a motel. She never returned to the residence.

Mother admitted to an event where she and Father were at a fast food restaurant and there was a woman in the car next to them who waved at Father. Father asked Mother if she knew who that was and Mother indicated that she did not. Father then stated, "Well, maybe it was my ex. I used to be a pretty hot commodity in the black market." Mother then proceeded to reach across the car and hit Father in the chest with the back of her hand, telling Father that was not funny. Mother testified Father only saw his daughter a total of three times after she was born and before the complaint was filed. She testified Father called one day wanting to see the child but Mother already had plans and told Father to call back the next day, which he did not do. Mother identified the Proposed Parenting Plan she previously had submitted to the Court. In that Plan, Mother proposed that Father have visitation every other weekend, alternating holidays, etc. Mother testified to problems she encountered which gave her concern about Father's ability to properly care for the child when the child was sick.

Tammy Lynn Coleman ("Coleman") was called to testify on Father's behalf. Coleman testified she has witnessed Father with his daughter and described Father as "excellent" with the child. Coleman observed Father feed, change, and otherwise interact with his daughter on three or four occasions.

Father did not testify at trial.

After hearing the proof, the Trial Court granted Mother a divorce based on Father's inappropriate marital conduct, in particular his "violent outbursts wherein he damaged or destroyed some personal property in close proximity, or at least in front of [Mother] and her older child, causing her to leave or be put out of the home . . . [and] which led to [Mother] ultimately

and finally leaving the residence." With regard to custody, the Trial Court stated it was charged with looking at the best interests of the child and the comparative fitness of the parties. In so doing, the Trial Court noted that it had the opportunity to observe and examine the credibility of the witnesses. The Trial Court then discussed the various statutory factors to be considered when determining the best interests of the child and the comparative fitness of the parties. After evaluating these various factors, the Trial Court concluded Mother should be designated the primary residential parent of the child, and Father would be granted visitation as described above. A final judgment was filed on August 12, 2002, entered *nunc pro tunc* July 18, 2002. Father appeals.

### Discussion

Father raises three issues on appeal. First, he claims the Trial Court erred when it refused to transfer the proceedings to Anderson County. Second, Father claims the Trial Court erred in granting the divorce to Mother. Father's final issue pertains to the Trial Court's designation of Mother as the primary residential parent and the amount of visitation he was awarded. Father maintains the Trial Court erred by not splitting the parenting time equally between the parties.

Our review of findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R.App. P. 13(d); *Brooks v. Brooks,* 992 S.W.2d 403, 404 (Tenn.1999). Review of questions of law is *de novo,* without a presumption of correctness. *See Nelson v. Wal–Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn.1999).

■ First, we will discuss Father's argument that the Trial Court erred when it refused to transfer the case to Anderson County. The statutory provisions relied on by Father provide as follows:

§ 36–5–3001. **Purposes and construction of part and limitation of scope of part.**—(a) The purpose of this part is to provide procedures for the intercounty *enforcement and modification* of child support and child custody cases and shall be liberally construed to effectuate its purposes. (emphasis added).

(b) The provisions for transfer in this part shall not apply to cases in any court regarding petitions for dependency and neglect, delinquency, unruly behavior, terminations of parental rights or adoptions pursuant to titles 36 and 37.

§ 36–5–3002. **Definitions.**—As used in this part, unless the context clearly requires otherwise:

(1) "Child's county" means the county in which the child who is subject to a support or custody order resides;

\* \* \*

(7) "Issuing court" means the court that issues a support or custody order or renders a judgment determining parentage or to which a support or custody order has been previously transferred;

\* \* \*

§ 36–5–3003. **Transfer of support or custody cases.**—(a) Except as provided in § 36–5–3001(b), a case which includes child support or custody provisions may be transferred between counties in this state without the need for any additional filing by the party seeking transfer, and without service of process upon the nonrequesting party, by the filing of a request by the requesting party as set forth herein.

(b) Upon receipt of a request, the case must be transferred by the clerk of

the issuing court, without order of the court, to a court of competent jurisdiction in the county where the child or children reside if each of the following applies:

(1) Neither the child or children, custodial parent/obligee, nor the non-custodial parent/obligor currently reside in the issuing county; and

(2) The child or children who are subject to the support or custody order currently reside in the county to which the case is to be transferred and have resided there for at least six (6) months....

Father argues it was mandatory for the Trial Court to transfer the case when he filed a request in accordance with Tenn. Code Ann. § 36-5-3004, which sets forth the procedure to transfer a case. Mother argues the statutory scheme applies only to situations where there is an existing order or judgment concerning child custody or support which a party is seeking to enforce or modify, and therefore the statute was not applicable to this case when Father filed his request. We agree with Mother.

Mother filed a Complaint for Divorce. Father filed a counterclaim for divorce. This lawsuit does not involve Mother or Father seeking to enforce or modify a previously entered final order concerning child custody or support. The appropriate venue for a divorce action is set forth in Tenn.Code Ann. § 36-4-105. As pertinent to this case, Mother was required to file the complaint "in the county where the parties reside at the time of their separation, or in which the defendant resides, if a resident of the state . . . ." Tenn.Code Ann. § 36-4-105. Mother and Father resided in Campbell County when they separated. Father continued to reside in Campbell County when the complaint was filed. Thus, Campbell County was the *only* coun-

ty with proper venue when this litigation began. On appeal, Father admits venue was proper in Campbell County when the Complaint for Divorce case was filed.

■ The precise issue, however, is whether the Trial Court, which had jurisdiction and venue when the divorce complaint was filed, was required to transfer the case to Anderson County upon Father's request. After reading the relevant statutory provisions set forth above, we believe the Legislature intended this statutory scheme to apply only in those cases where a party is seeking to "enforce" or "modify" a final order of child support or child custody. In fact, the Legislature left no room to quibble as the statute states that "[t]he purpose of this part is to provide procedures for the intercounty enforcement and modification of child support and child custody cases and shall be liberally construed to effectuate its purposes." Tenn.Code Ann. § 36-5-3001(a). Courts must "presume that the legislature says in a statute what it means and means in a statute what is says . . . ." *Mooney v. Sneed,* 30 S.W.3d 304, 307 (Tenn.2000). In the present case, there was no such final order of child support or child custody until the Trial Court rendered its judgment on July 18, 2002. The statutory provisions relied on by Father will come into play when, and if, one of the parties seeks to "enforce" or "modify" the portion of the July 18, 2002, final order pertaining to child custody and support, assuming the statutory requirements are met otherwise.

Father also argues the Trial Court erred in not treating his Tenn.Code Ann. § 36-5-3004 request to transfer as a motion to change venue. We have reviewed Father's request to transfer and it addresses only Tenn.Code Ann. § 36-5-3004. Nowhere in the request did Father assert venue should be changed in accordance with the relevant law authorizing such changes.

Because the Trial Court never was asked to consider whether it was appropriate to change venue separate and apart from the requirements of Tenn.Code Ann. § 36–5–3001 *et seq.*, we decline to address this issue for the first time on appeal. *In re Adoption of D.P.M.*, 90 S.W.3d 263, 266–67 (Tenn.Ct.App.2002). The Trial Court's Order refusing to transfer the case to Anderson County is affirmed.

■ We next address Father's argument that the Trial Court erred in granting a divorce to Mother. The Trial Court's conclusion that Mother was entitled to a divorce on the basis of Father's inappropriate marital conduct was based, in large part, on its factual determinations. Mother testified to several incidents where Father threw various objects in the presence of Mother and her older daughter, resulting in Mother's taking her daughter to a motel on two occasions. According to Father, these "uncorroborated" assertions are insufficient to award Mother a divorce, especially when Mother admitted to having struck Father at a fast food restaurant.

Tenn.Code Ann. § 36–4–101(11) defines inappropriate marital conduct to include "cruel and inhuman treatment or conduct towards the spouse as renders cohabitation unsafe and improper." The Trial Court had the benefit of observing Mother and her demeanor, as was noted by the Trial Court in its memorandum opinion. The Trial Court's factual determination involving witness credibility will be given great weight on appeal. *See Barnhill v. Barnhill*, 826 S.W.2d 443, 448 (Tenn.Ct.App.1991)(citing *Town of Alamo v. Forcum–James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959)). Without Father's testimony as to his version of these events, including the one at the fast food restaurant, the Trial Court was left with Mother's description. Mother's description of the incident at the fast food restaurant falls far short of the "physical abuse" Father claims to have suffered at the hands of Mother. In short, we do not believe the evidence preponderates against the findings of the Trial Court, and, therefore, we hold the Trial Court did not err in its conclusion that Mother was entitled to a divorce based on Father's inappropriate marital conduct.

■ Next, we address Father's argument that the Trial Court erred in not awarding equal co-parenting time. The standard of review on appeal for issues addressing child custody and visitation was set forth recently by our Supreme Court in *Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001). There, the Supreme Court stated:

The Court of Appeals correctly held that the standard for appellate review of a trial court's child visitation order is controlled by our decision in *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn.1988). There, we noted that " 'the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge.' " *Id.* at 429 (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn.Ct.App.1973)). Accordingly, we held that a "trial court's decision [on visitation] will not ordinarily be reversed absent some abuse of that discretion." *Id.*

In reviewing the trial court's visitation order for an abuse of discretion, the child's welfare is given "paramount consideration," *id.* (quoting *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn.1983)), and "the right of the noncustodial parent to reasonable visitation is clearly favored." *Id.* Nevertheless, the noncustodial parent's visitation "may be limited, or eliminated, if there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense." *Id.* (quoting *Weaver v. Weaver*,

37 Tenn.App. 195, 261 S.W.2d 145, 148 (1953)).

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott,* 33 S.W.3d 746, 752 (Tenn.2000); *State v. Gilliland,* 22 S.W.3d 266, 273 (Tenn.2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn.1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn.1998).

*Id.* at 85. Moreover, *Eldridge* pointed out that the function of the appellate courts is not to "tweak" a visitation order in the hopes that a more reasonable or "better" result can be reached. Appellate courts correct errors, and when no error is evident from the record, the trial court's ruling must stand. *Id.* at 88.

The factors to be considered in making a determination regarding child custody are set forth in Tenn.Code Ann. § 36–6–106(a) and include such factors as: (1) the love, affection and emotional ties existing between the parents and child; (2) the disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver; (3) the stability of the family unit of the parents; (4) the mental and physical health of the parents; and (5) each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

In the present case, Mother testified to the home environment she provided for the child and how she has cared for the child up until the day of trial. There certainly was adequate proof for the Trial Court to conclude Mother was a fit parent. Father does not argue otherwise. Rather, he claims the Trial Court erred by not granting him coequal parenting time. The critical flaw with Father's argument is the simple fact that he did not testify or offer any affirmative proof informing the Trial Court as to how he would be able to care for the child. For example, the record does not disclose if Father has become employed, whether he could properly feed and clothe the child, where he lives, whether he has a residence which is adequate for raising a child should he have coequal parenting time, etc.[3] In short, because Father chose not to offer any proof on the various factors to be considered by the Trial Court when making an award of custody and visitation, we cannot conclude the Trial Court abused its discretion when it concluded it was in the best interests of the child to designate Mother as the primary residential parent and grant Father visitation as set forth previously. The judgment of the Trial Court is affirmed in all respects.

### *Conclusion*

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for further proceedings as nec-

---

**3.** Coleman's testimony that she observed Father care for his daughter on three or four occasions and their relationship was "excellent" is altogether insufficient for this purpose.

essary, if any, consistent with this Opinion, and for collection of the costs below. Costs on appeal are assessed against the Appellant James Michael Flinn and his surety.