IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 23, 2004 Session

## LYDIA ANN BISHOP WATKINS v. WILLIAM C. WATKINS, JR.

**Appeal from the Chancery Court for Claiborne County**
**No. 14,113     John McAfee, Judge**

———————————

**No. E2003-03050-COA-R3-CV - FILED DECEMBER 14, 2004**

———————————

Lydia Ann Bishop Watkins ("Wife") filed for divorce from William C. Watkins, Jr., ("Husband") after thirty-five years of marriage. The Trial Court awarded Wife a divorce and distributed the marital property. The Trial Court also concluded that Wife was not economically disadvantaged and refused to award her any alimony. The Trial Court ordered each party to be responsible for his or her attorney fees. Wife appeals claiming the Trial Court's distribution of the marital property was inequitable, the Trial Court erred by not awarding her alimony in futuro, and the Trial Court erred by not requiring Husband to pay her attorney's fees. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and SHARON G. LEE, JJ., joined.

Rebecca A. Bell, Knoxville, Tennessee, for the Appellant Lydia Ann Bishop Watkins.

David H. Stanifer, Tazewell, Tennessee, for the Appellee William C. Watkins, Jr.

# OPINION

## Background

This litigation began in March of 2003 when Wife filed a complaint seeking a divorce from Husband on the ground of adultery. In the alternative, Wife claimed that irreconcilable differences had arisen between the parties, who had been married for over thirty-five years. The parties had no minor children when the case was tried. Wife sought a divorce, an equitable division of the marital property, alimony, and payment of her attorney fees. Husband filed an answer and counterclaim. Husband denied committing adultery and claimed he was entitled to a divorce based on Wife's alleged inappropriate marital conduct. In the alternative, Husband also claimed that irreconcilable differences had arisen.

The trial was held in late October and early November of 2003. When the divorce was granted, both parties were fifty-five years old and in relatively good health. Husband has been employed with the United States Department of Agriculture ("USDA") since 1970. Husband has a high school education and thirty to forty hours of college classes that he "took through my work." Husband's base salary was $53,000, although with overtime he earned in excess of $80,000 in 2002.

Wife graduated from high school and attended two years of business college. Prior to moving to Tennessee in 1986, Wife worked approximately thirteen years for a grain elevator company as a bookkeeper and accountant. In 1986, Husband's employment required the parties to move to Tennessee. Approximately six to eight months after moving to Tennessee, the parties opened a business in Middlesboro, Kentucky, known as First Place Trophies which sold trophies and provided engraving and screen printing services and the like. Wife worked only at First Place Trophies for the next seventeen years and continued to work there at the time of trial. Wife was almost exclusively responsible for running this business on a day to day basis, including hiring and training new employees, etc.

The Trial Court awarded Wife a divorce based on Husband's admitted adultery. The Trial Court concluded that the contributions of each of the parties to the marriage and acquisition of assets had been relatively equal. With regard to the property distribution, the Trial Court awarded Wife the marital residence and all of the equity in the residence, but also held her responsible for the mortgage. The residence was valued at $130,000 with an outstanding mortgage of 53,972.34, resulting in a net award to Wife as to the house of $76,027.66. Wife was awarded the household furnishings which the Trial Court valued at $20,000. The Trial Court also awarded Wife "$11,000 that is in The Farmers and Miners Bank account or which is held in a cashier's check." Wife was awarded her pension plan from a previous employer which would entitle her to receive $125 per month at retirement. With regard to the parties' business, the Trial Court determined the business was worth $425,000, but had debt totaling $200,000, thereby resulting in a net value of $225,000. The Trial Court determined the business' liquidated value to be between $125,000 and $150,000. Wife was awarded the entire interest in the business and likewise was held responsible for the business debts.

Husband was awarded the entire $50,975 contained in his thrift savings plan and a Chrysler Sebring valued at $7,500. While Husband is not eligible for social security retirement benefits, he is eligible when he retires for federal civil service retirement benefits in lieu of social security. The amount of Husband's projected future monthly retirement benefit from his civil service plan is approximately $3,000. The Trial Court determined that the combined present value of Husband's thrift account and his civil service retirement was $117,604. Husband was awarded all of his retirement benefits with one exception. More specifically, the Trial Court stated:

> [I]n order to insure that [Wife] can continue the same insurance coverage through [Husband's] federal employer [Wife] shall be awarded only the necessary portion of this retirement plan to insure [Wife] will continue to have insurance coverage.

After distributing the marital property, the Trial Court concluded that Wife was not economically disadvantaged or otherwise entitled to any alimony. The Trial Court also held that each party was responsible for his or her own attorney fees.

Wife appeals raising three issues. First, Wife claims the Trial Court failed to equitably distribute the marital property. Wife's second issue is her claim that the Trial Court erred when it refused to award her alimony. Wife asks this Court to award her alimony in futuro in the amount of $2,500 per month. Finally, Wife claims the Trial Court erred when it held her responsible for her own attorney fees.

## Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first discuss the Trial Court's division of the marital property. Tenn. Code Ann. § 36-4-121(c) requires a trial court to consider all relevant factors when making an equitable distribution of marital property, including:

> (1) The duration of the marriage;
>
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

-3-

(3)  The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4)  The relative ability of each party for future acquisitions of capital assets and income;

(5)  The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6)  The value of the separate property of each party;

(7)  The estate of each party at the time of the marriage;

(8)  The economic circumstances of each party at the time the division of property is to become effective;

(9)  The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10)  The amount of social security benefits available to each spouse; and

(11)  Such other factors as are necessary to consider the equities between the parties.

A trial court has wide discretion in dividing the interest of the parties in marital property.  *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1991).  As noted by this Court in *King v. King*, when dividing marital property:

> The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner.  The division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown*, 913 S.W.2d [163] at 168. . . . In the final analysis, the justness of a particular division of the marital property and

-4-

> allocation of marital debt depends on its final results. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990).

*King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 Tenn. App. LEXIS 100, at *11-12 (Tenn. Ct. App. Feb. 9, 1998), *no appl. perm. appeal filed*).

As noted previously, the Trial Court found the business to have a net value of $225,000, and a liquidated value between $125,000 and $150,000. The primary disagreement between the parties is whether these values assigned by the Trial Court included the $200,000 debt of the business. Husband claims that these values encompassed the debt, so the business was a net asset to Wife in the stated amounts. Wife, however, claims that the values assigned by the Trial Court do not take into account the debt. Wife claims the $200,000 in debt should be subtracted from the values assigned by the Trial Court, resulting in the net value of the business being only $25,000, and its liquidated value being a net liability of between $50,000 to $75,000.

The current value of the marital property awarded to Husband is $125,104. This figure is arrived at simply by adding the current value of his retirement plans ($117,604) and the car ($7,500). If Husband is correct that the Trial Court included the business debt when assigning values to the business, Wife's property award would include: the net value of the business ($225,000), the net value of the marital residence ($76,027.66), the household furnishings ($20,000), and the $11,000, all of which totals $332,027.66. If we accept Husband's argument that the Trial Court considered the debt when valuing the business, and we consider the liquidated value of the business as opposed to its net value, then Wife's property award would be between $232,027.66 and $257,027.66. We note that these totals do not include two items. First, they do not include a current value for Wife's pension from her previous employer as no such value was assigned to that asset by the Trial Court. Second, they do not take into account any social security retirement that Wife may receive. For the past two years Wife paid into the social security retirement system via withholdings from her paychecks from the business. There was no testimony at trial regarding the current value of Wife's social security retirement benefits, if any, or the amount Wife could expect to receive at retirement. We emphasize this point because Husband's civil service retirement is a benefit he will receive in lieu of social security retirement and was the largest component of his property award. As Husband's civil service retirement is properly considered in determining his overall property award, it is only fair to consider Wife's social security retirement as well.

If Wife is correct in her argument that the Trial Court did not take into account the business debt when assigning the values to the business, then the overall property distribution is dramatically different. While Husband's overall award would remain the same, i.e., $125,104, Wife's total award would be reduced by $200,000. Thus, if Wife's argument is correct, when considering the overall net value of the business, her award would total $132,027.66. When considering the liquidated value of the business, Wife's total would be reduced further to between $32,027.66 and $57,027.66. Relying on these figures, Wife claims the overall property distribution was inequitable.

-5-

In support of her argument that the Trial Court did not take into account the business debt, Wife filed a Motion to Consider Post Judgment Facts with this Court. In this motion, Wife claims that on April 22, 2004, she sold the business for $183,000, but the purchaser did not assume any of the $200,000 debt for which Wife remains responsible.[1] In other words, Wife claims to have sold the business for a net loss of $17,000. Based on this sale price, Wife argues that the Trial Court simply could not have included the business debt when it was assigning values to the business. We reject this argument for two primary reasons. First, Wife has offered no evidence that the sale was commercially reasonable. Second, at trial Wife testified that the gross sales for the business in 2002 were $425,721, and Wife entered into evidence the business tax return verifying this amount. The sales in 2002, therefore, averaged a little over $35,475 per month. Wife was running the business at the time of trial on November 3, 2003, when she was awarded the entire interest in the business. Wife testified at trial that the inventory in the store as of three weeks prior to the trial was $282,717.48, which represented the cost of the inventory, as opposed to its retail value. At that same time there was $200,000 in debt. Wife sold the business 5 ½ months after the trial. If business sales in late 2003 and early 2004 were roughly the same as they were in 2002, Wife would have had gross sales totaling over $195,000 in those five and one-half months after the trial and before the sale. In her Motion to Consider Post Judgment Facts, Wife makes absolutely no mention of what happened to the money, if any, generated from post-trial sales up until the time the business was sold. We do not know if Wife kept these funds or what happened to this money. Since Wife claims the business debt remained the same throughout this 5 ½ month period, all we do know is that Wife did not use these funds to pay off any of the $200,000 debt. As these "facts" are not of the type appropriate to be considered as post judgment facts, we deny Wife's Motion to Consider Post Judgment Facts.

We now undertake to determine whether the values assigned to the business by the Trial Court included the $200,000 debt. As mentioned above, Wife testified at trial, before she knew who would receive the business in the property division, that the cost of the inventory in the business was $282,717.48. Wife also testified that the equipment in the business was worth over $70,000, and she believed the value of the goodwill to be $50,000. This information was relied upon by Ralph Carter ("Carter"), a certified public accountant and the only expert witness to testify at trial. According to Carter, the business had $282,717 in inventory, $70,770 in equipment and fixtures, $14,500 in accounts receivable, goodwill worth $50,000, cash in the amount of $4,000, and a pick-up truck worth $4,000, thereby resulting in gross assets totaling $425,987. According to Carter, the business also had $200,000 in corresponding debt, resulting in a net value of $225,987, "to be exact." Based on Wife's testimony and that of Carter, it is abundantly clear to this Court that the Trial Court considered the business debt when it determined that the business had a net value of $225,000, and a liquidated value of $125,000 to $150,000.

Because we conclude that the business debt clearly was considered by the Trial Court, it necessarily follows that when using the net value of the business, the Trial Court's overall property distribution to Wife totaled $332,027.66, and the overall property distribution to Husband totaled

---

[1] The actual sale price was $175,000, but Wife was permitted by the contract to collect approximately $8,000 in outstanding accounts receivable.

$125,104. From a percentage standpoint, Wife was awarded 72.6% of the marital property, and Husband was awarded the remaining 27.4%. If we utilize the liquidated value of the business instead of the net value, Wife's total award is between $232,027.66 and $257,027.66, which equates to between 65% and 67.3% of the total property.

When making the property distribution, the Trial Court discussed all of the relevant factors contained in Tenn. Code Ann. § 36-4-121(c). One of the many factors to be considered is the overall health of the parties. At trial, Wife claimed that due to her age (55) and her health, she no longer was able to run the business and intended to sell it. It is for this reason that the parties and the Trial Court discussed both the business' net value as well as its liquidated value. Wife testified that she has lymphedema, a condition which affects her lower extremities. Wife sought to admit into evidence a letter by a physical therapist discussing Wife's current condition. Husband's counsel did not object to the admission of this document, stating "[r]eally the letter helps our position." Because there was no objection, the Trial Court allowed the letter to be admitted, notwithstanding the Trial Court's concern over its admissibility under the Tennessee Rules of Evidence. In any event, when discussing Wife's medical condition, the Trial Court stated as follows:

> [T]he Court is not going to give a tremendous amount of weight to that document. [It would be] different if you had a doctor or the deposition of a doctor or something along those lines. Apparently [Wife] has some difficulties, obviously she's testified to that, but she's had those difficulties prior, way before she even got into this business. I did make a note at least during the operation of the business she can find time to sit down ….

In short, the Trial Court found that Wife's health was not such that she could not continue to operate the business successfully, and we hold that the preponderance of the evidence does not weigh against this finding.

After considering the Trial Court's overall property distribution in light of the various factors set forth in Tenn. Code Ann. § 36-4-121(c), we are unable to conclude that the property distribution was inequitable or that the Trial Court otherwise abused its discretion when distributing the parties' marital property. We affirm the Trial Court's distribution of the marital property.

We next address whether the Trial Court erred when it refused to award Wife alimony. Because the amount of alimony to be awarded, if any, is within the sound discretion of the trial court in light of the particular circumstances of the case, appellate courts will not alter such awards absent an abuse of discretion. *Lindsey v. Lindsey*, 976 S.W.2d 175, 180 (Tenn. Ct. App. 1997). The factors to be considered in deciding whether to award alimony are contained in Tenn. Code Ann. § 36-5-101(d)(1)(E) and include:

-7-

(i)  The relative earning capacity, obligations, needs, and financial resources of each party including income from pension, profit sharing or retirement plans and all other sources;

(ii)  The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(iii)  The duration of the marriage;

(iv)  The age and mental condition of each party;

(v)  The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(vi)  The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(vii)  The separate assets of each party, both real and personal, tangible and intangible;

(viii)  The provisions made with regard to the marital property as defined in § 36-4-121;

(ix)  The standard of living of the parties established during the marriage;

(x)  The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(xi)  The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so;  and

(xii)  Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

In addition to the foregoing, Tenn. Code Ann. § 36-5-101(d)(1)(B) & (C)(Supp. 2004) recently was amended and now provides as follows:

-8-

(B)  The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage.  Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

(C)  It is the intent of the general assembly that a spouse who is economically disadvantaged relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance.  To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.  Where there is relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection (d), the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3).  An award of periodic alimony may be made either in addition to a rehabilitation award, where a spouse may be partially rehabilitated as defined in this subdivision (d)(1)(C), or instead of a rehabilitation award, where rehabilitation is not feasible.  When appropriate, the court may also award transitional alimony as provided in subdivision (d)(1)(D).

When reviewing a trial court's decision regarding alimony, we usually begin by examining the income and expenses of the parties.  As noted previously, Husband's base annual income was $53,000, but with overtime he has earned as much as $80,000.  At trial, Wife filed an "Affidavit of Lydia Ann Bishop Watkins' Monthly Expenses and Salary as Evidence in Demand for Alimony."  This affidavit shows monthly expenses of approximately $3,200, not including Wife's attorney fees.  Wife admitted, however, that some portion of the expenses in the affidavit were related to the business and were not her personal expenses.  Oddly enough, and notwithstanding the title of the affidavit, Wife did not include the amount of her monthly income in this affidavit.

Wife's 2002 income tax return showed gross income of $37,000. Wife testified that she learned in July of 2001 that Husband was having an affair. Approximately one month later, Wife began drawing paychecks from the business in the weekly amount of $1,200, "before taxes." The following is a small portion of Wife's cross-examination at trial:

> Q. So for 2002 the entire year at $1,200 a week is $66,400 for that year, is that correct?
>
> A. If you says it is. I don't have my calculator, but I am going to say that is.
>
> Q. And you have represented to the Court in 2002 … [t]hat you paid yourself $37,000; is that correct?
>
> A. Whatever my W-2 is what I am basing that on, but you remember I did not always write myself a paycheck every week.… All I would be able to do and tell you the truth is look at my ledgers that my bookkeeper has and tell you the exact dates that I wrote those checks. I mean, I can't – how do you expect me to remember two years ago?

After this discussion, the Trial Court understandably was confused as to how much Wife actually was earning and instructed the attorneys to clear this matter up. When Wife was asked to be more detailed, she testified that she wrote herself checks in the amount of $1,200 per week 75% of the time, or 39 weeks out of the year. Thus, based on Wife's own testimony, the Trial Court specifically found that Wife's annual income for the past two years actually was "$46,800 before taxes."

During closing arguments, Wife's counsel indicated that Wife wanted to sell the business and that she also wanted alimony in the amount of $2,500 per month because she was economically disadvantaged. The following discussion then took place:

> THE COURT: She's pulled $1,200 a week for 75 percent of the time just based on her testimony alone which equated to [almost] $50,000 last year. Now how is it that she's economically disadvantaged?
>
> MS. BELL: Well, if Your Honor does [order the parties to] sell the business she's not going to have any employment ….
>
> THE COURT: That makes no sense to me.…
>
> MS. BELL: [S]he's 55 years old, this is the time she should be retiring, should be kicking back and living the good life basically.…

THE COURT: [S]he's been in this business for 17 years.… She appears to be a very savvy lady, your client. She's very bright. She's very intelligent and a very good business woman.… I think she's a very good business woman and I don't understand the theory behind liquidating the business.

The Trial Court clearly was troubled by Wife's position that she wanted the business sold, which would eliminate her $46,800 in annual income, and at the same time be awarded $2,500 per month in alimony so she could pay her basic bills. According to the Trial Court, "It's sort of like you want your cake and [to] eat it too, saying, Well, let's just liquidate it and let's knock him in the head and take half his retirement and everything else." The Trial Court specifically found that Wife's current income from the business was sufficient to pay her monthly expenses.

Counsel for Husband phrased this issue before the Trial Court as follows: "Can you quit a job to draw alimony?" Certainly, no one would argue that Husband could quit his job where he has worked for over 30 years and demand Wife pay him alimony. Wife and Husband both had jobs. While we understand Wife's wish to retire from her job and have Husband fund her retirement by paying her alimony while he continues to work at his job, this Court, as did the Trial Court, finds no reason under the statute or case law to grant this wish. The reality of the situation is that neither party will be retiring or "kicking back and living the good life." Because the Trial Court concluded that Wife's physical condition did not prevent her from operating the business, a conclusion we have affirmed, the Trial Court acted well within its discretion when it considered Wife to have an annual income of $46,800 when it was in the process of determining whether alimony should be awarded to Wife.

We can summarize the basic facts after the property distribution as follows: Husband is 55, has an annual income of $53,000 to $80,000, and property valued at $125,104, most of which is his federal civil service retirement and cannot be liquidated. Wife is 55, has a business with a net value of $225,000 which enables her to earn an annual income of $46,800, other assets totaling $107,027.66, a pension from her previous employer worth $125 per month at retirement, and social security retirement valued at some unknown amount. It is likely that neither of these parties will enjoy the standard of living that they enjoyed while married, which is often what happens after a divorce. *See, e.g., Robertson v. Robertson*, 76 S.W.3d 337, 340 (Tenn. 2002) ("The parties' incomes and assets will not always be sufficient for them to achieve the same standard of living after divorce that they enjoyed during the marriage. *See Crabtree*, 16 S.W.3d at 359-60."). In light of these facts, we cannot conclude that the Trial Court abused its discretion when it found Wife was not economically disadvantaged as compared to Husband. We do not believe Wife is economically disadvantaged as compared to Husband simply because he earns somewhat more money than she does. The income disparity is not so significant that he can be expected to enjoy a higher standard of living than she will. This is even more apparent when considering that Wife was awarded the marital residence and all of the equity in that property, as well as the vast majority of the household furnishings. Husband had no cash from the sale of the marital residence to use in purchasing a new home, and very little, if any, of the parties' household furnishings to put in a home should he

purchase one. Husband would have to incur a significant amount of debt just to be able to live in a house equivalent to the house Wife was awarded, and he then would have to incur additional expense to have it furnished. Wife, obviously, will not have to do this.

After considering all of the relevant factors and reviewing the finding and reasoning of the Trial Court in detail, we conclude that the evidence does not preponderate against the Trial Court's relevant findings and that the Trial Court did not abuse its discretion when it refused to award Wife any alimony. Having found no abuse of discretion or other error by the Trial Court, we affirm the Trial Court's refusal to award Wife alimony.

The final issue is Wife's claim that the Trial Court erred when it required her to pay her own attorney fees. Attorney fee awards are treated as alimony. *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988). In determining whether to award attorney fees, a trial court should consider the relevant factors set forth in Tenn. Code Ann. § 36-5-101(d)(1)(E), *supra*. Awards of attorney fees are within the sound discretion of the trial court, and will not be disturbed on appeal unless the evidence preponderates against the award. *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). After considering all of the relevant factors, including Wife's need and Husband's ability to pay, we conclude the Trial Court did not err in requiring each party to pay his or her own attorney fees.

## Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are assessed against the Appellant, Lydia Ann Bishop Watkins, and her surety.

_____
D. MICHAEL SWINEY, JUDGE